Damon Jerome **RICHARDSON**,
Appellant,

v.

The **STATE of Texas**, Appellee.

No. 70746.

Court of Criminal Appeals of Texas,
En Banc.

Dec. 8, 1993.

Rehearing Denied May 25, 1994.

Clifford W. Brown and Mike Brown, Lubbock, for appellant.

Travis S. Ware, Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for State.

## OPINION

CAMPBELL, Judge.

At a trial held in the 350th District Court of Taylor County[1] in late September and early October of 1988, a jury found appellant, Damon Jerome Richardson, guilty as a party to the capital murder of three individuals during a single criminal transaction.[2] At the punishment phase of the trial, the jury answered affirmatively the punishment issues submitted to them under Article 37.071(b) of the Texas Code of Criminal Procedure, and appellant was sentenced to death.[3] Direct appeal to this Court was automatic under Article 37.071(h).[4] We now affirm.

In eight points of error, appellant argues: that the evidence at his trial was insufficient to prove that all three victims—Vivian Webb, Quinnie Smith, and Napoleon Ellison—were killed in a single criminal transaction; that the evidence was insufficient to satisfy the accomplice witness rule; that the evidence was insufficient because the law of parties does not apply to Texas Penal Code § 19.-03(a)(6)(A), the provision under which he was convicted; that the trial court erred in admitting certain photographs in evidence at the guilt/innocence phase; that the trial court erred in overruling his objection to the prosecutor's closing argument at the guilt/innocence phase; that the trial court, in its charge to the jury at the guilt/innocence phase, erroneously authorized a finding of guilt based upon a theory not supported by the evidence; that the trial court, in its charge to the jury at the punishment phase, erroneously instructed the jury with respect to the first punishment issue; and that the trial court, in its charge to the jury at the punishment phase, erroneously failed to allow the jury to consider certain mitigating evidence. With the exception of the points of error challenging the sufficiency of the evidence, appellant's points of error will be addressed in chronological order.

In his fourth point of error, appellant argues that he has been denied his liberty without due process of law because the evidence at his trial was insufficient to prove beyond a reasonable doubt that the victims—Webb, Smith, and Ellison—were all killed in the same criminal transaction.[5] Appellant contends that the evidence "suggests" the

1. Appellant's trial was held in Taylor County on a change of venue.

2. Texas Penal Code § 19.03(a)(6)(A), the statute under which appellant was convicted, provides that "[a] person commits [a capital] offense if he commits murder [by intentionally or knowingly causing the death of an individual] and the person murders more than one person during the same criminal transaction." Texas Penal Code § 7.02(a)(2) provides, in turn, that "[a] person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

3. At the time of appellant's trial, Article 37.071 provided in relevant part:

> (b) On conclusion of the presentation of the evidence [at the punishment phase], the court shall submit the following three issues to the jury:
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.
>
> \* \* \* \* \* \*
>
> (f) If a defendant is convicted of an offense under Section 19.03(a)(6), Penal Code, the court shall submit the three issues under Subsection (b) of this article only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment.

The record reflects that only issues (b)(1) and (b)(2) were submitted to the jury at appellant's trial.

4. All references to articles are to those in the Texas Code of Criminal Procedure.

5. The trial court's charge to the jury at the guilt/innocence phase authorized a finding of guilt if the jury concluded beyond a reasonable doubt that, *inter alia*, all three victims were killed in the same criminal transaction. See Tex.Penal Code § 19.03(a)(6)–(A), *supra*, footnote two (it is capital offense to murder *two* or more persons in same criminal transaction); see also *Fee v. State*,

victims were not all killed in the same criminal transaction. Appellant contends further that, "[b]ecause of the outstanding reasonable hypothesis that the victims were not murdered in the same criminal transaction . . ., no rational trier of fact could have found the essential elements of the capital crime beyond a reasonable doubt." The State responds that "there was evidence which, if believed by the jury as trier-of-fact, would prove that [all of] the murders occurred contemporaneously."

Appellant was charged with, and found guilty of, violating Texas Penal Code § 19.-03(a)(6)(A). See footnote two, *supra.* The State presented numerous witnesses and exhibits during the guilt/innocence phase. Appellant presented no evidence at the guilt/innocence phase. The key evidence was as follows:

Rodney Kennedy testified that on or about September 3, 1987, he saw appellant fire an Uzi machine gun behind the Seven Acres Lodge in Lubbock. Appellant's Uzi had a silencer attached to it.

Vincent McNeal testified that sometime before September 8, appellant told him that Webb and Ellison were "ripping him off" and that, consequently, "he had something for them." McNeal also testified that on or about September 8, he saw appellant fire a machine gun on a dirt road in Lubbock County.

Anita Hanson testified that on the evening of September 7, she, appellant, and Lambert Wilson attended a party at a mutual friend's home in Lubbock. While at that party, Hanson overheard appellant tell Wilson that he planned to kill Webb and Ellison. Wilson agreed to participate in the killings if appellant paid him to do so.

Hanson testified further that at approximately 12:30 a.m. on September 10, Wilson and Michael Stearns picked her up in a car at a Lubbock park and drove to Ellison's residence, which was also in Lubbock. Wilson, who was driving, parked the car about two blocks from Ellison's residence. Wilson and Stearns then exited the car and walked quickly toward the residence. Wilson carried an Uzi machine gun, and Stearns carried a shotgun. At that time, Hanson believed that Wilson and Stearns intended only to frighten Ellison.

About twenty minutes after Wilson and Stearns left, Hanson decided to walk to Ellison's residence herself. When she reached the driveway of the residence, she heard "a loud boom." She then ran inside. Once inside, she saw appellant, Wilson, Stearns, Ellison, and Rodney Childress. Ellison was sitting in a chair; his head was down and "there was blood on him." Appellant was carrying a pistol, Childress was carrying a shotgun, and Wilson was still carrying an Uzi. Both appellant and Wilson were wearing rubber gloves. Childress looked at Hanson and told her that appellant had forced him to kill Webb. Ellison then raised his head and asked Hanson to help him. Hanson asked appellant, who appeared to be in charge, whether she could telephone a doctor, but he said no. Appellant then took the Uzi from Wilson, handed it to Hanson, and ordered her to shoot Ellison. Appellant threatened to kill her if she did not. Hanson complied, firing three shots into Ellison. Appellant then instructed Wilson to remove some "drugs" from a cabinet beneath the kitchen sink, and Wilson did so. Shortly thereafter, Hanson left the residence with Wilson and Stearns.

Charles Johnson, a neighbor of Ellison, testified that around 12:30 a.m. on September 10, he (i.e., Johnson) left his residence and went out to his car to smoke a cigarette. While he was sitting in his car, he saw an automobile drive into Ellison's driveway. Moments later a van parked on the street in front of Ellison's residence. Appellant exited the automobile, and Hanson, Wilson, and two

other males exited the van.[6] Someone then knocked on the door of Ellison's residence. Ellison opened the door and let some or all of the males inside. A few minutes later, Johnson heard what sounded like a shotgun blast coming from the residence.

Five other neighbors of Ellison testified that at around 4:00 a.m. on September 10, they were awakened by several gunshots.

Lubbock Police Officer John Gomez testified that Webb, Smith, and Ellison were found dead in the Ellison residence on the afternoon of September 10. Lubbock Police Detective Walter Crimmins testified that a search of the residence revealed two plastic bags of marihuana, two shotgun shells, several nine-millimeter shell casings, and some photographs of appellant. Department of Public Safety firearms examiner Robert M. Buckner testified that all of the nine-millimeter shell casings came from the same weapon and that that weapon could have been an Uzi machine gun.

Finally, a forensic pathologist testified that all of the victims died of multiple gunshot wounds. Furthermore, because all of the victims had some wounds from which there had been little or no bleeding—indicating that the victims were already dead at the time those particular wounds were inflicted—the pathologist concluded that "probably there were two episodes of shooting."

■ The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that every state criminal conviction be supported by evidence that a rational factfinder could accept as sufficient to prove all of the elements of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). As an appellate court reviewing a cold record long after the jury has evaluated the evidence and made its finding of guilt, our task is to consider all of the record evidence and reasonable inferences therefrom in the light most favorable to the jury's finding and to determine whether,

based on that evidence and those inferences, a rational jury could have found all of the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In particular, "[i]n reviewing sufficiency of the evidence to show [the] 'same criminal transaction' [in the capital murder context], we ... look to see whether the jury could rationally conclude appellant engaged in a continuous and uninterrupted process, over a short period of time, of ... carrying out [the] murder of more than one person." *Rios v. State*, 846 S.W.2d 310, 314 (Tex.Crim.App.1992).

■ Utilizing the required standard of review, we must reject appellant's fourth point of error. Viewed in the light most favorable to the jury's verdict, the testimony of witnesses Hanson, Johnson, and the pathologist rationally supported the jury's conclusion, beyond a reasonable doubt, that all three of appellant's victims died in a single criminal transaction. Specifically, the testimony in question supports a conclusion that all three victims died in Ellison's residence shortly after 12:30 a.m., September 10, 1987. Point of error number four is overruled.

■ In his third point of error, appellant contends he has been denied his liberty in violation of Texas statutory law because the evidence at his trial was insufficient to corroborate the testimony of the accomplice witness, Anita Hanson. Appellant argues specifically that the non-accomplice evidence "only circumstantially prove[d] [his] presence and flight from the scene of the offense, his possession of a machine gun close in ... time to the offense, and the possible use of a machine gun in the murders." The State counterargues that "there was sufficient evidence of suspicious circumstances to connect appellant to the offense."

Article 38.14 provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the

---

6. Thus, Johnson's testimony deviated somewhat from Hanson's testimony.

defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Under Article 38.14, it is not necessary for the corroborating evidence to directly link the accused to the crime. *Reed v. State*, 744 S.W.2d 112, 126 (Tex.Crim.App. 1988). Nor is it necessary for the corroborating evidence to be sufficient in itself to establish guilt beyond a reasonable doubt. *Ibid.* Were the law otherwise, the testimony of the accomplice would be valueless. *Paulus v. State*, 633 S.W.2d 827, 844 (Tex.Crim. App.1982). Furthermore, as we explained in *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim.App.1984), "[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction."

Here, the State's non-accomplice evidence placed appellant at the scene of the crime at the time of its commission. In addition, the State's non-accomplice evidence established that, a few days before the commission of the crime, appellant (1) had ill feelings for both Webb and Ellison; (2) intended to act upon those feelings; and (3) possessed an Uzi machine gun with a silencer. Finally, the State's non-accomplice evidence established that an Uzi machine gun may have been used in the commission of the crime. We hold that this non-accomplice evidence tended to connect appellant to the crime and was, therefore, sufficient to meet the requirements of Article 38.14. Point of error number three is overruled.

In point of error number two, appellant contends he has been denied his liberty without due process of law because the evidence at his trial failed to prove a requirement for guilt under Texas Penal Code § 19.-03(a)(6)(A), to wit: that he *personally* killed more than one person in a single criminal transaction. Appellant insists that a consideration of the legislative history and text of § 19.03(a)(6)(A) compels the conclusion that the statute "is limited to cases of multiple murder in which a murderer is guilty by reason of his own deliberate conduct and not as a party." In other words, appellant argues the law of parties does not apply to prosecutions under § 19.03(a)(6)(A).

In *Johnson v. State*, 853 S.W.2d 527, 534 (Tex.Crim.App.1992), we considered and rejected arguments identical to those appellant makes in his second point of error. We decline the opportunity to revisit those arguments today. Appellant's second point of error is overruled.

In his sixth point of error, appellant complains of the admission, at the guilt/innocence phase, of five photographs of him found by police in Ellison's home after the murders. The photographs show appellant wearing expensive clothing, a substantial amount of jewelry, and a fur coat. The State offered the photographs "to show there [was] some connection between the [victims] and Damon Richardson." Appellant objected to the photographs on the basis of Texas Rule of Criminal Evidence 403.[7] Appellant argued specifically that the photographs were "not ... probative of any issue in the case" and only served to suggest that he was "involved in drug dealing."

Once a defendant objects to photographic evidence on the basis of Rule 403, it is the task of the trial court to weigh the probative value of the evidence against its potential for unfair prejudice. In undertaking this task, the trial court must assess the inherent tendency (if any) of the photographs to encourage resolution of material issues on an improper basis, and then must balance against that inherent tendency the host of factors affecting probativeness, including the relative weight of the evidence and the de-

---

7. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

gree to which its proponent might be disadvantaged without it. *Fuller v. State*, 829 S.W.2d 191, 206 (Tex.Crim.App.1992). An appellate court reviewing the trial court's decision may reverse it only for an abuse of discretion, i.e., only when the trial court's decision was outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990).

Plainly, the photographs in question were probative and relevant to the prosecution's case at the guilt/innocence phase, because they helped establish a link between appellant and his victims. Although the photographs may suggest that appellant was affluent, they do not in any way suggest the source of that affluence. Thus, we are not persuaded that, without question, the danger of unfair prejudice substantially outweighed the probative value of the photographs. Point of error number six is overruled.

■ In his seventh point of error, appellant argues the trial court erred in overruling his objections to the prosecutor's closing argument at the guilt/innocence phase of trial. The objections in question related to the prosecutor's references to appellant's fur coat and jewelry, as exhibited in the photographic evidence discussed previously. Appellant argues that the "State's counsel repeatedly referred to the contents of the photographs to suggest extraneous bad acts," i.e., appellant's drug dealing.

■ There are four areas of permissible prosecutorial argument: summation of the evidence, reasonable deduction from the evidence, answer to argument of opposing counsel, and plea for law enforcement. *Brown v. State*, 692 S.W.2d 497, 502 (Tex.Crim.App. 1985). The record in the instant case reflects that in his closing argument, the prosecutor referred to appellant on one occasion as "this unfortunate soul with the diamonds and gold and the mink coat;" on a second occasion, the prosecutor referred to appellant's "diamonds and gold jewelry." The prosecutor did not suggest the source of appellant's apparent affluence, however. His comments,

however irrelevant to appellant's guilt, were no more than a summation of the evidence in the record. Point of error number seven is overruled.

■ In his fifth point of error, appellant complains of the portion of the trial court's charge at the guilt/innocence phase that authorized a finding of guilt if the jury believed beyond a reasonable doubt that (1) either Wilson, Stearns, Childress, or Hanson intentionally or knowingly killed Ellison with a firearm; (2) either Wilson, Stearns, or Childress intentionally or knowingly killed Smith with a firearm; (3) either Wilson, Stearns, or Childress intentionally or knowingly killed Webb with a firearm; and (4) appellant, acting with an intent to promote or assist the said primary actors in the commission of the killings, solicited, encouraged, directed, aided, or attempted to aid the primary actors in the commission of the killings. Appellant contends this portion of the trial court's charge "erroneously authorized the jury to convict appellant upon a factual theory unsupported by the evidence." Specifically, appellant insists that

the court's charge authorized the jury to convict the appellant of capital murder in the event that [the jury] found that Lambert Wilson, Rodney Childress, Michael Wayne Stearns or Anita Hansen [sic] caused the death of the deceased victims, and if [the jury] further believed that the appellant was criminally responsible for the actions of any of the four named persons in causing the death of the victims. There is insufficient evidence to prove beyond a reasonable doubt that Lambert Wilson, Rodney Childress or Michael Wayne Stearns intentionally or knowingly caused the death [sic] of the victims, or any of them, either as a principal or as a party. *The sole evidence connecting them to the commission of the offense is the uncorroborated testimony of the accomplice Anita Hansen [sic]. See [point of error number three, dealing with Article 38.14, the accomplice witness rule].* Therefore, the court's charge authorizing the conviction of the appellant upon a jury

determination that he was criminally responsible for the conduct of Lambert Wilson, Rodney Childress or Michael Wayne Stearns is erroneous, as unsupported by the evidence. *As the evidence is insufficient to convict the named codefendants [sic] as principals, it follows that the court has authorized conviction of the appellant on a theory unsupported by the evidence.*

(Emphasis added.)

■ It is certainly true that if the State is to prove a defendant's guilt as a party beyond a reasonable doubt, the State must first prove the guilt of another person(s) as the primary actor(s). *Forbes v. State*, 513 S.W.2d 72, 79 (Tex.Crim.App.1974). However, the accomplice witness statute, by its clear terms, has no application to the State's proof of the guilt of the primary actors in this context. And we decline the opportunity to import such an accomplice witness rule into this context as a requirement of the common law. Here, the State's evidence was sufficient to rationally prove beyond a reasonable doubt that Wilson, Stearns, Childress, and/or Hanson were guilty of the capital murder of Ellison, Smith, and Webb, either as primary actors or as parties. Point of error number five is overruled.

■ In his eighth point of error, appellant complains of the following portion of the trial court's charge at the punishment phase:

You are further instructed that before you may answer "yes" to [Punishment] Issue No. 1, you must find from the evidence beyond a reasonable doubt that the defendant intended or contemplated the life of NAPOLEON ELLISON would be taken either by his own acts or the acts of another or others in his presence who were acting with him in the commission of the offense; *or that the defendant's participation was major and his mental state was one of reckless indifference to the value of human life.*[8]

(Emphasis added.) Appellant argues, as he did below, that the emphasized language "fails to conform to [the requirements of] Article 37.071 of the Texas Code of Criminal Procedure" and "has the effect of lowering the standard and burden of proof for an affirmative answer to [the first punishment issue] because it indicates that a finding of reckless indifference would be sufficient as opposed to actual, reasonable expectation and contemplation of the death of Napoleon Ellison."

■ Assuming *arguendo* that the trial court's charge was erroneous for the reason advanced by appellant, we still need not reverse if we conclude that the charge error caused appellant no harm. *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Crim.App.1986). In making this determination, we must examine "the entire jury charge, the state of the evidence, including contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984). Furthermore, in making our determination, we may presume that the jury acted rationally, at least absent a showing to the contrary.

After examining the entire record, we conclude that the error in question caused appellant no harm. All of the evidence presented to the jury with respect to appellant's guilt showed that his conduct was intentional, premeditated, and deliberate, not merely reckless. No evidence was presented from which the jury could have concluded rationally that appellant's conduct was anything less than intentional, premeditated, and deliberate. Therefore, given the jury's finding of guilt and its affirmative answer to the first punishment issue, the jury must have found that appellant's conduct was committed deliberately and with the reasonable expectation that Ellison's death would result. We note also that the prosecutor's closing argument contained nothing which might have invited

8. Apparently, the trial court was attempting to comply with the requirements of *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). We express no opinion with respect to the correctness of this attempt.

the jury to answer the first punishment issue on the ground appellant's conduct was reckless rather than deliberate. Point of error number eight is overruled.

 Finally, in point of error number one, appellant, citing *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), argues the trial court erred in overruling his objection to the charge at the punishment phase of his trial. Appellant argues, as he did below, that the charge "provided no vehicle" for the jury "to fully consider and give effect" to evidence of his disadvantaged background, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Appellant argues further that his "evidence of an impoverished and neglected childhood is relevant to his culpability beyond the scope of the [Article 37.071 punishment] issues submitted,[9] and that the jury was unable to express its 'reasoned moral response' to that evidence in determining whether death was the appropriate punishment."

The record reflects that, at the punishment phase, appellant presented evidence that his mother was "in and out" of penal institutions and had little to do with his upbringing; that he never knew his father; that when he was very young, he and his six siblings were raised by his maternal grandmother in substantial poverty and with little supervision; that sometimes he and his siblings went hungry for lack of food; that sometimes "they would go out and steal, go in other people's houses [looking for] food ... to survive"; that appellant got "in trouble with the law ... twelve times ... for stealing something to eat"; that sometimes, when his mother was around, she "would go in the stores and entertain the clerks while the children [were] taking food—taking clothes and what they wanted out of the stores"; that when appellant was nine or ten years old, he was sent by state authorities to the Texas Boys Ranch and, later, to the Giddings State School; that when he arrived at the Texas Boys Ranch, he

was illiterate, stuttered badly, and was a "slow learner"; and that he was released from state care when he was fifteen or sixteen years old.[10]

 The Eighth Amendment, made applicable to the states by the Due Process Clause of the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962), prohibits "cruel and unusual punishments." The death penalty is unconstitutionally "cruel" if it is inflicted despite the existence of factors that, according to contemporary societal standards of morality, reasonably warrant a sentence less than death. *Woodson v. North Carolina*, 428 U.S. 280, 303–304, 96 S.Ct. 2978, 2990–2991, 49 L.Ed.2d 944 (1976). Accordingly, sentencers must be allowed to consider and give effect to proffered evidence regarding (1) the defendant's background, (2) the defendant's character, and (3) the circumstances of the offense that reasonably could be thought truly mitigating and thus reasonably warranting a sentence less than death; otherwise, the risk is unacceptably high that an unwarranted, cruel death sentence will be imposed. *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605–606, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). Sentencers do not have discretion to extend mere mercy or sympathy, however, because such discretion would inevitably result in the inequitable, arbitrary imposition of the death penalty, a result expressly condemned in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). As the Supreme Court carefully explained in *Penry v. Lynaugh*, 492 U.S., at 319, 109 S.Ct., at 2947:

> Underlying *Lockett* and *Eddings* is the principle that *punishment should be directly related to the personal culpability of the criminal defendant.* If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the

---

9. See footnote three, *supra.*

10. The record reflects that appellant was 23 years old at the time of the offense.

belief, long held by *this society*, that defendants who commit criminal acts *that are attributable to* a disadvantaged background, or to emotional and mental problems, may be less [morally] culpable than defendants who have no such *excuse.*

(Emphasis added; internal quotation marks and citations omitted.)

Thus, as Judge MILLER, writing for this Court, explained in *Mines v. State,* 852 S.W.2d 941, 951 (Tex.Crim.App.1992), evidence about a defendant's background or character is "in fact 'mitigating' [and] relevant to the individualized assessment of the propriety of the death penalty for the offender [only] if there is a nexus between this evidence and the circumstances of the offense which tends to excuse or explain the commission of the offense, suggesting that particular defendant is less deserving of a death sentence." We have reiterated this point on several occasions. See, e.g., *Gunter v. State,* 858 S.W.2d 430 (Tex.Crim.App. 1993); *Satterwhite v. State,* 858 S.W.2d 412 (Tex.Crim.App.1993); *Muniz v. State,* 851 S.W.2d 238, 256 (Tex.Crim.App.1993); *Nobles v. State,* 843 S.W.2d 503, 506 (Tex.Crim. App.1992); *Richard v. State,* 842 S.W.2d 279, 283 (Tex.Crim.App.1992); *Goss v. State,* 826 S.W.2d 162, 165 (Tex.Crim.App.1992) (plurality opinion); *Lewis v. State,* 815 S.W.2d 560, 567 (Tex.Crim.App.1991).[11]

The special issues required by Article 37.071 allow the jury to consider and give effect to most types of mitigating evidence that defendants proffer as a basis for a sentence less than death. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Sometimes, however, defendants proffer mitigating evidence that is not relevant to the special issues or that has relevance to the defendant's moral culpability beyond the scope of the special issues. *Penry v. Lynaugh,* 492 U.S., at 329, 109 S.Ct., at 2952. In such cases, the jury must be specially instructed in a way that allows it to consider and give effect to such evidence. *Ibid.* In short, truly mitigating evidence must not be placed beyond the effective reach of the sentencer; the sentencer must be able to consider in some manner all of a defendant's mitigating evidence. *Johnson v. Texas,* —— U.S. ——, ——, ——, 113 S.Ct. 2658, 2668, 2671, 125 L.Ed.2d 290 (1993).

Appellant argues that his evidence of a disadvantaged background was placed beyond the effective reach of the jury. We perceive no Eighth Amendment error, however. As noted previously, under the Eighth Amendment sentencers must be allowed to consider and give effect to proffered evidence of a defendant's background and character if, from the viewpoint of society as a whole, that evidence could reasonably be thought mitigating, i.e., if there is a nexus between that evidence and the commission of the offense which tends to excuse the commission of the offense. Here, appellant has failed to demonstrate such a nexus. Appellant has made no showing that, from the viewpoint of society as a whole, his alleged childhood experience of poverty, parental neglect, illiteracy, and a speech disorder tends to excuse his capital crime. *Goss v. State,* 826 S.W.2d, at 165. He has also made no showing that the

11. Judge BAIRD, in his dissent, asserts that this Court "created" the nexus requirement out of whole cloth. That is plainly incorrect. A nexus between proffered background and character evidence and the commission of the offense is required by the reasoning of *Penry* itself, where the Supreme Court carefully explained that such evidence is relevant to punishment only "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less [morally] culpable than defendants who have no such excuse." 492 U.S., at 319, 109 S.Ct., at 2947. In other words, to be truly "mitigating" in the proper sense of the term, background and character evidence must, from the viewpoint of society as a whole, tend to excuse the commission of the offense. If Judge BAIRD is correct and there need be no nexus between proffered "mitigating" evidence and the commission of the crime, then a capital jury would be free to arbitrarily extend mere mercy or sympathy, resulting in a system in which there is no meaningful basis for distinguishing the cases in which death is imposed from the cases in which it is not. Such a system was condemned in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and to revive it at this point would bring Eighth Amendment jurisprudence full circle.

alleged fact that his mother taught him to shoplift tends to excuse his capital crime. "'Sympathetic as we may be to his plight during childhood ..., we do not think appellant might rationally be found less morally culpable for his adult behavior on this basis, according to contemporary moral values as shared by a significant segment of our society.'" *Gunter v. State*, 858 S.W.2d, at 446, quoting *Draughon v. State*, 831 S.W.2d 331, 339 (Tex.Crim.App.1992).

Our conclusion might be different if appellant had presented evidence that his mother had taught him to kill or commit other crimes of violence, or if his capital crime had begun as a robbery. Such evidence might, from the viewpoint of society as a whole, tend to excuse appellant's criminal behavior in that it might indicate that his personality had been damaged through no fault of his own and that his capital crime was caused in part by that damaged personality.[12]

Having discerned no reversible error, we AFFIRM the judgment of the trial court.

MALONEY, J., concurs in the disposition of point of error number one and joins the remainder of the opinion.

CLINTON and OVERSTREET, JJ., dissent.

BAIRD, Judge, dissenting.

Believing the majority erroneously resolves appellant's first point of error, I respectfully dissent.

## I.

In *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the United States Supreme Court determined that

Tex.Code Crim.Proc.Ann. art. 37.071, as applied, operated in an unconstitutional manner in failing to provide a vehicle for the jury to consider and give effect to Penry's mitigating evidence of a disadvantaged background and organic brain damage and moderate retardation which resulted in poor impulse control and an inability to learn from experience. The Court recognized that:

> ... defendants who commit criminal acts that are attributable to a *disadvantaged background*, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.[1]

*Penry*, 492 U.S. at 319, 109 S.Ct. at 2947 (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987)).

The Court concluded art. 37.071 did not provide the jury with a vehicle to consider and give effect to Penry's mitigating evidence:

> ... In order to ensure "reliability in the determination of death is the appropriate punishment in a specific case," the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime.

> In this case, the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and *abused background* by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its "reasoned moral response" to that evidence in rendering its sentencing decision....

*Penry*, 492 U.S. at 328, 109 S.Ct. at 2951–52 (quoting *Woodson v. North Carolina*, 428

---

12. Judge BAIRD, in his dissent, has developed an argument that is not in appellant's brief at all. Judge BAIRD insists, although without clear explanation, that Dr. Grigson's testimony "established a nexus between appellant's disadvantaged background and the commission of the charged offense." But Grigson's testimony did no such thing. Grigson testified only that persons with childhood criminal records like appellant's are likely to become criminals as adults. Grigson's testimony, in context, cannot be construed as truly mitigating, because it provided no basis on which a jury could reasonably conclude that appellant was less than fully morally culpable for his capital crime.

1. All emphasis is supplied unless otherwise indicated.

U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)).

Unfortunately, the Supreme Court offered no guidance on the appropriate instructions or vehicle for our applications of *Penry*.[2] Regrettably, the subsequent cases from the Supreme Court are equally void of guidance. *See, Graham v. Collins,* 506 U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993); *and Johnson v. Texas,* —— U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

## II.

This Court's struggle with the application of *Penry* is well chronicled. That struggle led a majority of this Court to create a "nexus" requirement for a defendant to successfully rely on *Penry*. *Nobles v. State,* 843 S.W.2d 503 (Tex.Cr.App.1992). In other words, to be entitled to relief under *Penry,* a defendant must establish "a nexus between . . . [the mitigating] evidence and the circumstances of the offense which tends to excuse or explain the commission of the offense, suggesting that . . . [the defendant] is less deserving of a death sentence." *Mines v. State,* 852 S.W.2d 941, 951 (Tex.Cr.App.1992). Stated conversely,

> [W]here the evidence presented by defendant's witnesses failed to show a connection between the events they described and

the commission of the crime, then that "evidence is not relevant, *beyond the scope of the special issues,* to the jury's individualized assessment of Appellant's moral culpability for the crime."

*Nobles,* 843 S.W.2d at 506 (quoting *Goss v. State,* 826 S.W.2d 162 (Tex.Cr.App.1992) [emphasis in original] ).

I lodged a dissent in *Mines* because there simply is no basis for the nexus requirement in the Eighth Amendment. *Mines,* 852 S.W.2d at 952 (Baird, J., dissenting). And I continue to believe

> the nexus requirement restricts the Eighth Amendment and violates the explicit holding of *Penry* that a jury must be able to "consider and give effect to *any* mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime."

*Mines,* 852 S.W.2d at 960 (quoting *Penry,* 492 U.S. at 328, 109 S.Ct. at 2951 [emphasis in original] ).[3] Nevertheless, the nexus requirement has been adopted by a majority of this Court and has become settled law. Therefore, regardless of my personal beliefs, the doctrine of *stare decisis* compels me to apply the "nexus" requirement. *See, Ex parte Porter,* 827 S.W.2d 324, 327 (Tex.Cr. App.1992) (Baird, J., dissenting).[4] But *stare decisis* does not demand that I blindly ac-

---

**2.** We have subsequently approved two such vehicles: the "nullification instruction," *Fuller v. State,* 829 S.W.2d 191 (Tex.Cr.App.1992); and, an additional punishment issue, *State v. McPherson,* 851 S.W.2d 846 (Tex.Cr.App.1992).

**3.** The Supreme Court has never considered whether a nexus is required under the Eighth Amendment. However, the Supreme Court recently granted seven petitions for certiorari, vacated our judgments, and remanded each to this Court for consideration under *Johnson.* One such case is *Mines. Mines v. Texas,* —— U.S. ——, 114 S.Ct. 42, 126 L.Ed.2d 13 (1993). The remaining cases are *Earhart v. Texas,* —— U.S. ——, 113 S.Ct. 3026, 125 L.Ed.2d 715 (1993); *Granviel v. Texas,* —— U.S. ——, 113 S.Ct. 3027, 125 L.Ed.2d 715 (1993); *Hawkins v. Texas,* —— U.S. ——, 113 S.Ct. 3029, 125 L.Ed.2d 718 (1993); *Lucas v. State,* —— U.S. ——, 113 S.Ct. 3029, 125 L.Ed.2d 717 (1993); *Richardson v. Texas,* —— U.S. ——, 113 S.Ct. 3026, 125 L.Ed.2d

715 (1993); *and, Zimmerman v. Texas,* —— U.S. ——, 114 S.Ct. 374, 126 L.Ed.2d 324 (1993).

In spite of these remands, the majority's consideration of *Johnson* is limited to one sentence: . . . In short, mitigating evidence must not be placed beyond the effective reach of the sentencer; the sentencer must be able to consider in some manner all of a defendant's mitigating evidence. *Johnson v. Texas,* [—— U.S. ——, ——, ——] 113 S.Ct. 2658, 2668, 2671 [125 L.Ed.2d 290] (1993).

Majority op., 879 S.W.2d at 884.

**4.** In *Gearheart v. State,* 81 Tex.Crim. 540, 197 S.W. 187, 188–189 (App.1917), we explained the doctrine of *stare decisis:*

> . . . when a rule has been once deliberately adopted and declared and uniformly followed, it should not be abandoned except upon the most urgent reasons.

quiesce to an absurd holding and an unfair application of our previous opinions in order to avoid an unpalatable result.

## III.

The majority opinion offers only a partial recount of the evidence developed at the punishment phase of appellant's trial. Majority op., 879 S.W.2d at 883. However, a complete review of the record reveals a nexus between the instant offense and appellant's disadvantaged background. Dr. James Grigson, a psychiatrist, testified on behalf of the State. In response to a hypothetical question, which included acts similar to those committed by appellant in the instant offense, Dr. Grigson concluded that appellant would be a continuing threat to society. However, the testimony of Grigson was interrupted in order for appellant to present evidence of his (appellant's) disadvantaged background. (This testimony is recounted in the majority opinion.) Grigson was then recalled as a witness and the following exchange took place:

Q. After you testified on direct examination, we allowed the Defense to introduce some evidence, and *part of that evidence had to do with the background of the Defendant in this case* ... which included the fact that he—by the time he was 11 years old had already had at least 12 run-ins with the law; that he grew up out at Texas Boys Ranch, which was a home for boys who had been having problems with the law. Does that fact, asking you to assume those facts, in any way change your opinion about the probability of the ... [appellant] for committing criminal acts of violence which would be—which would constitute a continuing threat to society?

A. No, that would in no way cause me to change that opinion, but it certainly does add substance to *validating that opinion. It's far more likely with that type of background* and with escalation of violence that that person is—they are going to continue the same behavior.

Q. What do you mean by "escalation of violence"?

A. Well, you have individuals that are breaking the rules, showing disregard—disregard to authority figures and breaking relatively minor rules. As they move up the scale of increasing violence, assault, rape, attempted murder, murder, manipulation of people to be involved in criminal behavior, *those are your most dangerous people that you can encounter in our society.*

During its argument at the punishment phase of the trial, the State used Grigson's testimony as the basis to request an affirmative answer to the second statutory punishment issue.

Question number two is obviously the one where we have heard most of the testimony, "Is there a probability, 'probability,' that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?" Think about the evidence that you have heard to that issue. *There has been a wealth of evidence talking about the pattern of violence that ... [appellant] has already established. Twelve run-ins with the law by the time he was 11, 11 years old. Think of your kids at home, 11 years old. That's young.*

And, now, the Defense is going to get up here and tell you, "Well, he was just stealing to eat." Well, Ladies and Gentlemen, this crime that he committed that he's on trial for has nothing to do with him eating. He didn't go kill these people for food. He killed them for the almighty dollar and the almighty drug. He wasn't stealing to eat. He wasn't killing to eat. And you can look at things like that.

You heard witness after witness come on the stand and talk about they had known Damon Richardson for 15 years, for 10 years, for 11 years, and they all have the same opinion about his reputation, that his reputation for being peaceable and law-abiding was bad. You heard from people in the drug enforcement administration.

You heard from captains at the Lubbock Police Department. You heard from undercover detectives at the Sheriff's Department. You heard from a juvenile probation officer. You heard from a DPS narcotics agent. Over and over again, you heard the same thing that this reputation is bad.

And then we got a little bit more specific for you. We know that Damon has been to the pen in Kansas, and, again, you have the penitentiary packet here to look at. You had the fingerprint expert; we know it's him, there is no dispute that that is him. The picture, there is not mistaken who that is, and look at that indictment that's contained in that penitentiary packet. He went down for burglary, and he went down for theft, and what was he stealing. Food? Huh-uh. Guns. *This poor child that can't have enough to eat and has to resort to a life of crime is stealing guns.*

He gets out of the penitentiary, and obviously he is very reformed at that point. Days after he gets out of the penitentiary, what does he do? Goes joy riding in Lubbock and to show the other guys what a tough person he is, he says, "Watch this," as two innocent people, that he doesn't even know, ride by on a motorcycle, "Watch this," and shoots them. And you heard that from the stand under oath. It was totally unimpeached. He shoots them. Has that anything to do with stealing for food when he was 11 years old? Does that have anything to do with the fact that maybe he's had a rough life growing up, and maybe he has had to go down to the Texas Youth Council, to TYC, and maybe he has had to go to the penitentiary, but he's building, he's building up.

And you have heard about, I think you heard it mentioned a couple of times, *the escalating factor, the escalation of violence. Well, you don't need a psychiatrist to tell you that. That's common sense.* It's common sense. Again, we brought these psychiatrist to you for one reason, and we told you that on jury selection, that you could consider their testimony if you chose to. If it helps you at all, it's there for you. We aren't here to cram it down your throats or anything. *They talk about this escalating violence starting back when he was 11 years old with his first brushes with the law, and gradually until the little brushes don't become brushes anymore, they become penitentiary time, they become shooting people randomly on the streets of Lubbock, Texas.*

Grigson's testimony established a nexus between appellant's disadvantaged background and the commission of the charged offense, and tended to explain the commission of the offense.[5] *Mines,* 852 S.W.2d at 951. However, the majority conveniently omits Grigson's testimony from its discussion of appellant's first point of error. In addition to that glaring omission, the majority deviates from the nexus requirement by holding that, in order to establish a nexus, appellant was required to provide "evidence that his mother had taught him to kill or commit other crimes of violence...." Majority op., 879 S.W.2d at 885. This holding is patently absurd. There is no basis for this holding in *Penry* or any other case from the Supreme Court or from this Court. And the majority can not cite any authority in support of its absurd holding. In *Penry,* the Supreme Court stated "the jury must be able to *consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime."* *Penry,* 492 U.S. at 328, 109 S.Ct. at 2951. Moreover, the holding is belied by the testimony of Grigson. Capital murder can be attributed to criminal behavior that

**5.** Even as appellant contended his disadvantage childhood warranted a penalty less than death, the State contended the same evidence required an affirmative answer to the second statutory punishment issue. As in *Penry,* appellant's mitigating evidence became a two-edged sword: "it

may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Penry,* 492 U.S. at 324, 109 S.Ct. at 2949. Penry suffered from poor impulse control and an inability to learn from experience.

does not involve a crime of violence. As Grigson explained:

> A. ... I have examined kids that are 11 years old that are charged with murder, but that's really rare. *Most of the time whenever they are that age you are talking about stealing, theft, playing hooky, but the fact that you have 12 run-ins, 10 run-ins, with the law, you are primarily showing an early disregard for rules, regulations, and for authority figures, whether those are parents, school teachers, and that's extremely important* when you then connect that in to repeated acts of severe violence. That means that you really could have predicted down here as it went up the scale what was going to occur.

### IV.

For these reasons, I believe there was a nexus between appellant's mitigating evidence and the offense which tended to explain the commission of the offense. Today the majority bastardizes the child it sired in *Goss, Nobles,* and *Mines.* Because the majority fails to follow the binding precedent from this Court, I respectfully dissent.