### Ex parte Damon Jerome RICHARDSON, Applicant.

### No. 74,221.

Court of Criminal Appeals of Texas.

March 13, 2002.

---

David L. Botsford, Walter C. Long, Austin, for appellant.

Michael West, Special Prosecutor, Dallas, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

COCHRAN, J., delivered the opinion of the Court, joined by KELLER, P.J., MEYERS, PRICE, WOMACK, JOHNSON, HERVEY and HOLCOMB, JJ.

In his application for a writ of habeas corpus, applicant alleges twenty points of

constitutional error in his conviction for capital murder under Texas Penal Code, Sections 19.02(a)(1) and 19.03(a)(6)(A). This Court ordered points 13, 14, 15, and 17 filed and set for submission.[1] Because we agree that the credibility of the State's only eyewitness, Anita Hanson, was a crucial issue in applicant's trial, we conclude that the State had an affirmative constitutional duty under *Brady v. Maryland*[2] to disclose material evidence that impeached her testimony. We further find that applicant has satisfied his burden of proving, by a preponderance of the evidence, the facts that entitle him to habeas relief. Therefore, we grant habeas relief.

## I.

In our published opinion on applicant's direct appeal from his capital murder conviction,[3] this Court described the key evidence at trial. We briefly recite that evidence here.

A grand jury indicted applicant and three co-defendants (Michael Stearnes, Lambert Wilson, and Rodney Childress) for the September 10, 1987, capital murders of Napoleon Ellison, Quinnie Smith, and Vivian Webb.[4] Mr. Ellison allegedly worked for applicant, dealing cocaine that applicant smuggled into Lubbock;[5] Ms. Smith and Ms. Webb were members of Ellison's household. The co-defendants were tried separately; applicant stood trial first.

Anita Hanson, who claimed longtime association with applicant, was the State's star witness. Ms. Hanson provided crucial eyewitness testimony regarding applicant's

---

1. Applicant makes the following claims for relief:

   Applicant was denied his rights to a fair trial, to due process, and to due course of law, as such rights are guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 13 and 19 of the Texas Constitution, by [the State's] intentional elicitation of the perjured testimony of Anita Hanson, without whose testimony there would have been legally insufficient evidence.

   Applicant was denied his rights to a fair trial, to due process, and to due course of law as such are guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 13 and 19 of the Texas Constitution, by [the State's] suppression of material, exculpatory evidence: the police diary of Officer Tanya Goldston.

   Applicant was denied his rights to a fair trial, to due process, and to due course of law as such are guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 13 and 19 of the Texas Constitution, by [the State's] suppression of material, exculpatory evidence: the sworn statements of Gary Max Self and Larry Donall Jones.

   Applicant was denied his rights to a fair trial, to due process, and to due course of law as such are guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 13 and 19 of the Texas Constitution, by [the State's] suppression of material, impeachment evidence: the 'First Amended Information' against Charles Johnson for Injury to a Child.

2. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

3. *Richardson v. State*, 879 S.W.2d 874 (Tex. Crim.App.1993).

4. At the time of the offense, Texas Penal Code, Section 19.02(a)(1) provided that "[a] person commits [murder] if he ... intentionally or knowingly causes the death of an individual." Section 19.03(a)(6)(A) provided that "[a] person commits [capital murder] if he commits murder as defined under Section 19.02(a)(1) of this code and ... the person murders more than one person ... during the same criminal transaction."

5. Applicant's co-defendants allegedly had similar drug ties to Mr. Ellison and applicant.

participation in the murders. She testified to attending a September 7th party with applicant and Lambert Wilson at a mutual friend's home in Lubbock. While there, she overheard applicant tell Mr. Wilson that he planned to kill Webb and Ellison,[6] and that Wilson agreed to participate in the killings if applicant paid him to do so.

Ms. Hanson testified that Wilson and Michael Stearnes picked her up in a car at a Lubbock park around 12:30 a.m. on September 10, 1987. They drove to Ellison's residence. Wilson, the driver, parked the car about two blocks away. Wilson and Mr. Stearnes left Hanson in the car and walked quickly toward the residence. Wilson carried an Uzi machine gun, and Stearnes carried a shotgun. Hanson testified that she believed Wilson and Stearnes intended only to frighten Ellison.

Hanson waited in the car for approximately twenty minutes before deciding to walk to Ellison's residence herself. She heard "a loud boom" when she reached Ellison's driveway, and she ran inside the house. There she saw applicant, Wilson, Stearnes, Mr. Childress, and Napoleon Ellison. Ellison was slumped in a chair with his head down, and "there was blood on him." Hanson testified that applicant carried a pistol, Childress had a shotgun, and Wilson still carried an Uzi. Applicant and Wilson both wore rubber gloves. Mr. Childress told Hanson that applicant had forced him to kill Webb. Ellison then raised his head and asked Hanson to help him. Hanson asked applicant, who appeared to be in charge, whether she could telephone a doctor, but he said no. Applicant then took the Uzi from Wilson, handed it to Hanson, and ordered her to shoot Ellison. Hanson testified that applicant threatened to kill her if she did not. Hanson complied, firing three shots into Ellison. Applicant then instructed Wilson to remove some "drugs" from a cabinet beneath the kitchen sink, and Wilson did so. Shortly thereafter, Hanson left the residence with Wilson and Stearnes.[7]

**6.** Other associates of applicant provided applicant's alleged motive. Vincent McNeal testified that, sometime before September 8th, applicant told him that Webb and Ellison were " 'ripping him off' " and that, consequently, " 'he had something for them.' " Mr. McNeal's testimony also circumstantially linked applicant to one of the alleged murder weapons (an Uzi machine gun). McNeal testified that, on or about September 8th, he saw applicant fire a machine gun on a dirt road in Lubbock County. At applicant's habeas hearing, however, McNeal recanted his trial testimony. McNeal testified that he never heard applicant state that he was sick and tired of the victims ripping him off, and he and the applicant never fired guns together. McNeal also stated that, prior to trial, he told "Buster" Tucker, an investigator for the District Attorney's office, that he had lied to police. Mr. Tucker denied that McNeal had ever said this and asserted that he would have taken McNeal to a prosecutor immediately if McNeal had.

Another associate, Rodney Kennedy, also testified to seeing applicant fire an Uzi machine gun, behind the Seven Acres Lodge in Lubbock on or about September 3, 1987. Applicant's Uzi had a silencer attached to it.

**7.** Charles Johnson, Ellison's neighbor, testified that, around 12:30 a.m. on September 10, he (i.e., Johnson) went out to his car to smoke a cigarette. While sitting in his car, he saw an automobile pull into Ellison's driveway. Moments later, a van parked on the street in front of Ellison's residence. Applicant got out of the car, and Hanson, Wilson, and two other males got out of the van. Someone then knocked on the door of Ellison's residence. Ellison opened the door and let some or all of the males inside. A few minutes later, Mr. Johnson heard what sounded like a shotgun blast coming from the residence. Five other neighbors of Ellison testified that around 4:00 a.m. on September 10, they were awakened by several gunshots. In our opinion on direct appeal, we noted the discrepancy between Hanson's and Johnson's account of Hanson's

Webb, Smith, and Ellison were found dead in the Ellison residence on the afternoon of September 10. A forensic pathologist testified that all of the victims died of multiple gunshot wounds. A search of the residence revealed two plastic bags of marijuana, two shotgun shells, several nine-millimeter shell casings, and some photographs of applicant. A Department of Public Safety firearms examiner testified that all of the nine-millimeter shell casing came from the same weapon and that the weapon could have been an Uzi machine gun.

An anonymous telephone call brought Hanson's possible knowledge of the murders to the attention of the District Attorney's Office. Police detectives questioned Hanson, and on September 15, 1987 she gave her first of six sworn statements regarding the murders. The District Attorney's Office placed Hanson under "protective custody" as a material witness beginning shortly after her first statement. By October 15, 1987 Hanson had identified herself as a participant, having sworn that she fired three bullets from an Uzi machine gun into Napoleon Ellison. Nonetheless, Hanson remained unindicted and in protective custody in various locations

around Lubbock for approximately a year, until she testified at applicant's trial in late September 1988. A security detail composed of two Lubbock police officers per shift[8] watched over Hanson twenty-four hours a day. After she testified at applicant's trial, Hanson received a $4,000 relocation allowance from the District Attorney's Office.

Applicant stood trial in the 72nd District Court of Lubbock County in late September and early October of 1988.[9] A jury found him guilty as a party[10] to the capital murder of three individuals during a single criminal transaction and answered all punishment questions affirmatively. The trial judge sentenced applicant to death. Direct appeal to this Court was automatic under Article 37.071(h).[11] We affirmed the trial court's judgement and sentence.[12]

Applicant's co-defendants fared significantly better. Michael Stearnes was acquitted[13] in 1990 after a bench trial in which his defense counsel fatally impeached Anita Hanson's credibility, confronting her with her prior inconsistent sworn statements and eliciting her admission to having lied under oath. During Lambert Wilson's subsequent jury trial, Ms. Hanson admitted that she had not

---

arrival. *Richardson*, 879 S.W.2d at n. 6. We now note that the habeas judge found Johnson not to be a credible witness.

8. Perhaps a dozen officers were assigned to Hanson's security detail for varying lengths of time, including Tonya Goldston, Brian Jenkins, Debra Pinkston, Ruth Ann Surface, Rosanna Langston, and their supervising officer, Lieutenant Richard Foster.

9. Applicant's trial was held in Taylor County on a motion for change of venue.

10. Texas Penal Code Section 7.02(a)(2) provides that "[a] person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or

assist in the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

11. All references to articles are to those in the Texas Code of Criminal Procedure.

12. 879 S.W.2d at 877.

13. *State v. Stearnes*, No. 87–406,927 (99th Dist. Ct., Lubbock County, Tex., March 24, 1990). In fact, the trial court found that, on the basis of the evidence, Mr. Stearnes was not even present at the murder scene.

always told the truth while testifying in Michael Stearnes' trial. The jury in Mr. Wilson's trial deliberated for merely two hours before returning a "not guilty" verdict.[14] Rodney Childress never stood trial for the murders. On the State's motion, the trial court dismissed the indictment against Mr. Childress, finding that the evidence was insufficient to sustain a conviction, even though Hanson had named Childress as Vivian Webb's actual killer.[15]

Applicant filed his present application for a writ of habeas corpus. After a fifteen-day habeas hearing, the trial court entered extensive factual findings that are supported by the habeas record transmitted to this Court.

## II.

■ ■ To prevail upon a post-conviction writ of habeas corpus, applicant bears the burden of proving, by a preponderance of the evidence, the facts that would entitle him to relief.[16] Where, as here, the applicant claims that the prosecution suppressed exculpatory evidence and thereby violated his right to due process,[17] applicant must satisfy a three-pronged test.[18] Applicant must first show that the State [19] failed to disclose evidence, regardless of the prosecution's good or bad faith.[20] He must then show that the withheld evidence is favorable to applicant.[21] Finally, the applicant must show that the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.[22] As in any habeas proceeding, the applicant must prove the constitutional violation and his entitlement to habeas relief by a preponderance of the evidence.

**14.** *State v. Wilson*, No. 87–406,923 (237th Dist. Ct., Lubbock County, Tex., November 2, 1990).

**15.** *State v. Childress*, No. 87–406,924 (140th Dist. Ct., Lubbock County, Tex., November 6, 1990).

**16.** *Ex parte Morrow*, 952 S.W.2d 530, 534 (Tex.Crim.App.1997); *Ex parte Thomas*, 906 S.W.2d 22, 24 (Tex.Crim.App.1995); *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex.Crim.App. 1993); *Ex parte Adams*, 768 S.W.2d 281, 287–88 (Tex.Crim.App.1989); *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex.Crim.App.1985).

**17.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (prosecution has affirmative duty to disclose material, exculpatory evidence to an accused; prosecution's suppression of co-defendant's confession violated Due Process Clause of the Fourteenth Amendment); *Ex parte Kimes*, 872 S.W.2d at 702.

**18.** *Kimes*, 872 S.W.2d at 702–03 (*citing United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

**19.** The "State" includes not only the particular prosecutor, but members of his office and members of law enforcement connected to the investigation and prosecution of a particular case. *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Ex parte Mitchell*, 977 S.W.2d 575, 578 (Tex.Crim.App. 1997).

**20.** *Kimes*, 872 S.W.2d at 702–03.

**21.** *Id.*

**22.** *Id.* at 702–03. A habeas applicant demonstrates that he is entitled to relief for a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. at 435, 115 S.Ct. 1555; *Ex parte Adams*, 768 S.W.2d at 290. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

## III.

■ Applicant complains that the District Attorney failed to disclose the existence of a diary kept by Tonya Goldston, formerly a police officer with the Lubbock Police Department, which would have provided the defense team with powerful impeachment evidence against the State's only eyewitness, Anita Hanson. Applicant further contends that, with the credibility of the State's star witness thus compromised, there is a reasonable probability that the jury would not have convicted applicant.

Officer Goldston, who did not testify at applicant's capital murder trial, served on Hanson's security detail and maintained a diary or log of the time she spent guarding Hanson. At the habeas hearing, Officer Goldston identified a copy of her original diary and testified that in late April or early May of 1988, she gave the diary to then-Assistant Chief of Police, Michael Huffman, at Huffman's request. Assistant Chief Huffman [23] identified a memorandum regarding Goldston's diary that he prepared and sent to the District Attorney, along with the diary, on May 10, 1988. Although applicant's trial did not begin until September 6, 1988, some three months later, members of the prosecution team testified at the habeas hearing that they had not seen the diary nor were they aware that it existed.[24] The diary was found in applicant's file at the District Attorney's Office, however, at some point after applicant's conviction. Based on this and other testimony, the habeas judge found that Officer Goldston's diary was not disclosed to applicant's defense team. Although we are not bound to follow the habeas judge's findings of fact,[25] we find that the record supports his findings. Accordingly, we find that applicant has met the first of the three required tests for habeas relief.

Applicant must also show that the diary constituted exculpatory evidence.[26] After identifying her diary and affirming the truth of its contents, Officer Goldston testified that the State's star witness was not a truthful person and that she, Goldston, kept the log to protect herself from any false accusations or complaints Hanson might make about her, as Hanson had made such complaints about other officers who guarded her.[27] Goldston's diary identified fellow officers on the security detail

23. Chief Huffman, like Officer Goldston, did not testify at applicant's capital murder trial.

24. Several prosecutors testified at the habeas hearing that they would have disclosed the diary as possible *Brady* material, had they known of the diary's existence.

25. *Ex parte Morrow*, 952 S.W.2d at 534; *Ex parte Adams*, 768 S.W.2d at 288.

26. *Kimes*, 872 S.W.2d at 702–03; *Ex parte Maldonado*, 688 S.W.2d at 116.

27. Officer Goldston's diary related one such incident in which Hanson falsely accused Officer Goldston and fellow officer, Brian Jenkins, of sleeping on duty:

Anita told the D.A.'s office that she had sneaked out while [Officer Jenkins] and I were sleeping on duty. She could not remember what day she did this. She said she left through her glass sliding door, climbed over the balcony [rail], dropped down onto the fence and then climbed down to the ground. She said that she walked around in front of this apartment and returned to her room in the same way she got down.

One would have to be quite athletic, or very tall, to accomplish this. Anita is neither. I feel that she only stepped out onto the balcony. I tried this action myself (in front of [another officer] and accomplished it without making a sound. [Officer Jenkins] and I feel that she went outside the night we heard the click sound—Oct. 29th.

and described her interactions with Hanson, as well as information other officers conveyed to her. Applicant's habeas counsel called five of the officers that Goldston's diary had identified as members of the protective detail and elicited each officer's opinion regarding Hanson's truthfulness.

Without exception, each officer testified that Hanson was not a truthful person.[28]

Under *Bagley*, exculpatory evidence includes impeachment evidence.[29] The live testimony of six law enforcement officers who had extensive personal contact with Hanson and were therefore in a position to form an opinion regarding her credibility was extremely powerful impeachment evidence. We find that the diary and the testimony it led to were favorable to applicant.

Lastly, applicant must show that the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. Applicant's habeas hearing spanned fifteen full days and included testimony from forty-five witnesses. Among his many factual findings regarding applicant's claims, the habeas trial judge[30] determined that "[t]here [was] no question but that by the time of applicant's trial Anita Hanson's credibility was a major issue in the case."[31] The habeas trial judge heard extensive testimony regarding Anita Hanson's credibility (or lack thereof), the State's knowledge of her credibility problems, the circumstances of her year secreted away in protective custody, and whether Hanson had agreed to testify against applicant in return for the District Attorney's explicit or implicit promise not to prosecute her for killing Napoleon Ellis.

Anita Hanson's eyewitness testimony clearly was crucial to the State's capital murder case against applicant. Her account placed applicant at the murder scene at the time of the killings and assigned primary responsibility for the murders to applicant, whom Hanson claimed was in charge and ordered Hanson to shoot Ellison. She was the *only* eyewitness who testified to the actual killings and applicant's participation. The State's other witnesses established only that (i) appellant possessed a motive to commit the murders and intended to act on that motive, and (ii)

---

Officer Jenkins also testified at the habeas hearing and corroborated Officer Goldston's account.

Hanson also falsely accused Officer Goldston of telling her, Hanson, that there was a contract on Hanson's life and that Officer Goldston claimed to have "special snitches who told [her] things."

**28.** Lieutenant Foster: "... [C]ertainly, her truthfulness was questionable." Officer Goldston: "I do not believe her to be truthful." Officer Jenkins: "I would have to say that [Hanson's reputation for truthfulness] was bad." Officer Surface: I never trusted her as a truthful person. Officer Pinkston: "I don't believe she was [truthful]." When asked whether her opinion "was also consistent with what [Pinkston] heard from other officers about [Hanson's] reputation for truthfulness," namely, Hanson's "bad reputation for truth and veracity," Pinkston replied, "Yes, sir."

Each of the officers testified that he would have complied with a subpoena to testify at applicant's capital murder trial.

**29.** *Kimes*, 872 S.W.2d at 702.

**30.** The Hon. Judge David McCoy presided over applicant's habeas hearing; the Hon. Judge Thomas Blackwell presided at applicant's trial.

**31.** The parties did not dispute this point.

two witnesses had observed him firing a machine gun on some prior date.[32] It was upon her testimony that the jury convicted applicant of capital murder and sentenced him to death. Applicant's co-defendants, however, who were tried separately, were either acquitted or their indictments were dismissed as, over time, Anita Hanson's credibility was fatally impeached by her ever-increasing number of self-admitted perjurious statements. Her story unraveled entirely in subsequent trials. We find that applicant has demonstrated a reasonable probability that, had the Goldston diary been timely disclosed and the six law enforcement officers testified, Anita Hanson's credibility would have not only been impeached, but severely undermined.[33] Because her testimony was critical to the State's case, we agree with the habeas judge who concluded: "I find as a matter of law that the evidence would, in all likelihood, create the probability sufficient to undermine the confidence in the outcome of the proceeding."

Accordingly, we grant relief on applicant's fourteenth constitutional claim and set aside the conviction. Applicant is remanded to the custody of the Lubbock County Sheriff to answer the indictment.

KEASLER, J., concurred in the disposition.

---

**32.** Refer to note 7, *supra,* regarding Charles Johnson's testimony.

**33.** Applicant's trial counsel *did* impeach Ms. Hanson's testimony in other ways, but nothing that applicant's attorney presented at trial could compare with a parade of six law enforcement officers testifying that, in their opinion, Ms. Hanson was not a credible witness and not worthy of belief under oath. *See* Tex.R. Evid. 405.