NUMBER 13-01-386-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG







JIMMY GARZA DELGADO, JR.
, Appellant,


v.



THE STATE OF TEXAS, Appellee.





On appeal from the 24th District Court


of Calhoun County, Texas.






MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Yañez and Castillo


Opinion by Justice Castillo



 The State of Texas charged Jimmy Garza Delgado, Jr. with the murder of
twenty-three-year-old Christopher John Vasquez. (1) A jury convicted Delgado, and the
trial court sentenced him as an habitual felony offender to life imprisonment. (2) By
three issues, Delgado contends: (1) the State's failure to disclose exculpatory
evidence prejudiced him in his defense; (2) the trial court abused its discretion in
admitting and excluding evidence; and (3) the evidence is insufficient to support his
conviction. We affirm. 

I. APPLICABLE APPELLATE RULES


 On June 5, 2001, Delgado filed a timely notice of appeal. The rules of appellate
procedure governing how appeals proceed in criminal cases were amended effective
January 1, 2003. Generally, rules altering procedure do not fall within the prohibition
in the Texas Constitution against retroactive application of laws that disturb vested,
substantive rights. See Tex. Const. art. I, § 16; see also Ibarra v. State,
11 S.W.3d 189, 192 (Tex. Crim. App. 1999). Therefore, this Court applies the
current rules of appellate procedure to this appeal. We may not affirm or reverse a
judgment or dismiss an appeal for formal defects or irregularities in appellate procedure
without allowing a reasonable time to correct or amend the defects or irregularities. 
Tex. R. App. P. 44.3. We also are prohibited from affirming or reversing a judgment
or dismissing an appeal if the record prevents the proper presentation of an appeal and
can be corrected by the trial court. Tex. R. App. P. 44.4(a). Accordingly, we abated
the appeal on July 22, 2003 and ordered a supplemental record to include, in
compliance with rule 25.2(a)(2), the trial court's certification of Delgado's right of
appeal. See Tex. R. App. P. 25.2(a)(2). We received a supplemental record on
July 31, 2003 that includes the trial court's certification of Delgado's right of appeal. 
We now turn to the merits. 

II. RELEVANT FACTS


 This is a memorandum opinion not designated for publication. The parties are
familiar with the facts. We will not recite them here except as necessary to advise the
parties of our decision and the basic reasons for it. See Tex. R. App. P. 47.4.

A. Non-Accomplice Testimony

 The jury heard that Vasquez owed Delgado a $300 drug debt. Knowing
Delgado wanted payment and was looking for him, Vasquez left Victoria, Texas to get
away from the drug dealer. He moved in with his girlfriend April Hinojosa in nearby
Port Lavaca. Vasquez's mother, Janie Padilla, told the jury that Delgado came to her
home looking for her son after Vasquez moved from Victoria. She did not tell Delgado
where to find him. Delgado last came to her house, asking for Vasquez, about two
weeks before Vasquez was murdered. Vasquez's sister, Roseanna Vasquez, told the
jury that Delgado came to her home, also, looking for Vasquez. Delgado called her as
well, late at night, and demanded to know where to find Vasquez. Roseanna Vasquez
told the jury that her brother did not want Delgado to know where to find him. She
was at their mother's house when Delgado showed up with two other men, Michael D.
Martinez and Joe Pineda, in a brown Cadillac she thought belonged to Pineda. Delgado
did all the talking. Roseanna Vasquez testified that Delgado told her Vasquez owed
him money for cocaine. She offered to pay Delgado the money herself. Delgado
refused, insisting that the dispute was between Vasquez and him. Like their mother,
Roseanna Vasquez did not tell Delgado where to find her brother. 

 Hilburn Hisquierdo told the jury he was at home in Port Lavaca the morning of
Friday, March 31, 2000. Around 9:00 or 10:00, a man Hisquierdo identified as
Martinez arrived in a Cadillac at Hisquierdo's house. Hisquierdo knew Martinez
through Pineda, his cousin. Martinez was accompanied by Delgado and two men
Hisquierdo identified at trial as Matthew Lee Salazar and Amador Anzualda. Martinez
was driving. Hisquierdo went for a drive in the Cadillac with Martinez and the others. 
The men cruised around and smoked marijuana. Martinez asked Hisquierdo where
Vasquez lived. Hisquierdo pointed out where Vasquez was living with April Hinojosa. 
Martinez then drove Hisquierdo home. 

 Along with April Hinojosa and Vasquez, April's sister Jacqueline and their
brother Raymond were at the house the morning of March 31. About 10:00 a.m.,
Raymond Hinojosa testified, a dark-colored Cadillac, which looked black in the shade,
pulled up to the house. He was sure of the time, he assured the jury, because he had
taken his girlfriend to the hospital for a 9:30 appointment that morning and got back
home a little before 10:00. A man got out of the car and approached the house. He
knocked on the front door and announced, "Just tell Chris that it's his home boy,
Jimmy Delgado, from Victoria." Jacqueline Hinojosa went to get Vasquez. He came
to the door. After stepping outside and talking with Delgado, Vasquez went back in
the house to change clothes. Delgado became impatient and demanded to know what
Vasquez was doing. Delgado said "he had to hurry up and get back to Victoria by
twelve," Raymond Hinojosa told the jury. Delgado said Vasquez "needed to hurry the
[expletive] up." 

 Meanwhile, inside their bedroom in the house, Vasquez told April Hinojosa he
did not want to leave with Delgado. She told him not to go. He replied, "Well, if I
don't go they might do something here." As he was leaving, he instructed April that
if he was not back in an hour-and-a-half to call the police and tell them he was with
Jimmy Delgado. According to April Hinojosa, Vasquez had told her the week before
that he owed Delgado money and was going to have to pay him. 

 Raymond Hinojosa testified he watched Vasquez climb in the back seat of the
Cadillac. Delgado sat in the front passenger seat. Another man, who had been
standing in the front yard while Delgado waited for Vasquez, was the driver. Raymond
Hinojosa was unable to see any other passengers in the car because of its tinted
windows. 

 As Vasquez was leaving, April Hinojosa checked her watch. It was 10:15 the
morning of March 31. Jacqueline Hinojosa testified that she was sure the time was
10:00 or 10:15 because she remembered her sister April checking the time as
Vasquez left. 

 An hour-and-a-half passed. April Hinojosa called Vasquez's mother, who told
her to call the police. She did. 

 Meanwhile, Laura Villarreal testified, she arrived at her ailing father's home in
Port Lavaca the morning of March 31. About 10:00, as was their custom, she drove
him to Magnolia Beach. On the way, as she drove slower than the posted speed limit,
she noticed that a dark, shiny, four-door Cadillac followed too close behind her car. 
She had to pull into the oncoming-traffic lane to make her left turn, so the Cadillac
could pass on the right. The Cadillac continued straight, heading toward Indianola. 
She drove past the LaSalle Monument, between Indianola and Magnolia Beach. She
did not see the Cadillac again. She testified the vehicle passed her at 10:30,
according to her car clock. The next day, she drew a diagram for the police and noted
the time as "10:00." 

 Delbert Woods testified he was living in Indianola on March 31, 2000. Around
10:30 that morning, he told the jury, his wife Dorothy and he drove by the LaSalle
Monument on the way to the grocery store. He saw three Hispanic men. A Cadillac
was parked nearby. On the Woods' return trip, about 12:45, the men and the Cadillac
were gone. The distance between Port Lavaca and the monument, Woods testified,
is roughly eighteen miles. The distance takes about twenty to thirty minutes to drive. 
Dorothy Woods also testified that they saw three men at the LaSalle Monument
about 10:30 a.m. 

 Trina Stanfield, a records administrator with the Port Lavaca Police Department,
testified she received a dispatch call that morning at 11:49. April Hinojosa told her,
Stanfield testified, that two men had come to her house, spoken with her boyfriend,
and tried to create a disturbance. Her boyfriend "had come back into the residence
and advised her that he was going to go ahead and go with the two subjects, because
they were trying to cause a disturbance, and that if he was not back within an hour-and-a-half to call the police." April Hinojosa reported to Stanfield that her boyfriend
owed some money to one of the men, provided the name "Jimmy Delgado," and
described the car as a black Cadillac. 

 By 12:12 p.m. on March 31, 2000, a police officer had interviewed April
Hinojosa and completed a report. At 12:18, Raymond Hinojosa reported a dark-colored Cadillac parked at a local restaurant. According to Stanfield, the vehicle turned
out to be the wrong Cadillac. 

 Around 1:30 that afternoon, Della Johnson and her husband were walking on
the beach near the LaSalle Monument. Her husband found a tennis shoe in the water
and retrieved it. He turned around and said "there's a body there." The Johnsons
called the police. 

 At 1:13 p.m., Bryan Redding, a Calhoun County deputy sheriff, was dispatched
to the scene. He arrived at 1:24. He spotted a body face down on the beach, close
to the water's edge. The body had multiple stab wounds. April Hinojosa identified the
body as Vasquez's. Investigators recovered a blood-splattered gold nugget bracelet
at the scene, near some bloody rocks. 

 Roman Goodwine, a Victoria County deputy sheriff, testified he was dispatched
on April 1, 2000 to a scene involving clothes on fire under a bridge. He retrieved a
partially burned shoe, white socks, khaki Dickies, belted white sport pants, boxer
shorts, a large white muscle shirt, and a brown tee shirt with "La Vida Loca" on the
back. Lisa Baylor, a forensic serologist, testified she found no blood on the partially
burned clothing. 

 Two special agents with the Federal Bureau of Investigation, Chris Cole and
Gregory Kuntz, testified that in January of 2000, a federal grand jury had indicted
Martinez, identified by Hisquierdo as the driver of the Cadillac who had picked him up
the morning of March 31, for drug distribution. A warrant issued for his arrest. On
April 6, 2000, the agents arrested Martinez. Martinez cooperated with the federal
authorities. He confessed his involvement in a number of crimes, including Vasquez's
murder. He implicated three other men and provided details of the crime. Martinez
originally told the federal authorities that the car used in Vasquez's murder belonged
to his girlfriend, but later admitted he had driven the men to Port Lavaca that morning
in his mother's Cadillac. 

 The authorities impounded the car and searched it for trace evidence. Fabric
from the right rear passenger door tested positive for human blood. Baylor testified
forensic tests determined that the DNA profile of the blood in the car was consistent
with Salazar's, and Salazar could not be excluded as the donor. Baylor also told the
jury that other forensic tests determined that the blood on the gold nugget bracelet
found at the scene was consistent with Vasquez's DNA profile. 

 Local investigators and federal agents testified that Martinez assisted in a search
for the weapons used in Vasquez's murder. With Martinez's assistance, investigating
officers recovered a butcher knife with a wooden handle wrapped in black electrical
tape. Medical examiner Roberto J. Bayardo testified that the knife could have caused
Vasquez's wounds. However, despite a thorough search, the authorities were unable
to locate a green folding knife that Martinez informed them also was used in the
murder. 

 Martinez told the authorities that he was a member of a highly structured group
of individuals with bonds forged in the Texas prison system. (3) He admitted he was a
"soldier" in the cadre (4) of felons. A "soldier," testimony at trial showed, is the lowest-level member of the cadre. Anzualda and Salazar were "soldiers" also, Martinez told
the authorities. Delgado, Martinez informed them, was a "sergeant." 

 Baylor also told the jury that she found no human blood on the wooden-handled
butcher knife the federal authorities recovered with Martinez's assistance. The
authorities also were unable to recover any fingerprints from the knife. Baylor testified
that blood on the gold nugget bracelet found at the scene was consistent with
Vasquez's DNA profile. 

 Texas Ranger Morgan Miller interviewed Delgado after his arrest. The jury
viewed a video recording of the interview. Delgado told Miller that he knew and had
been friends with Vasquez since the age of eight. He said "it could have been" the
Friday of Vasquez's murder when he last saw him. Delgado said he was in Port
Lavaca with another person who lived there when he stopped to see if Vasquez had
the $50 he owed Delgado. Delgado said he and the second man left with Vasquez,
dropped Vasquez off at "some other girl's house," and returned to Victoria. Delgado
said, "Whatever happened after we left, that is on them." He added, "I wasn't
anywhere else where he was at that morning, neither was this other person." He
acknowledged that he "could see it" if Vasquez had been "beat to death," but that he
would not kill anyone for $50. Delgado denied participating in Vasquez's murder. 

 Delgado refused to disclose who was with him the morning he visited Vasquez,
Miller testified. If he were to tell Miller who was with him that day, Delgado insisted,
the person might implicate someone else and then that person might implicate
someone else. Miller testified that he deduced from Delgado's statement that four
people were involved in the murder.

 During the videotaped interview, Miller showed a picture of Pineda to Delgado. 
Delgado asked if Pineda had been arrested for Vasquez's murder. Delgado's demeanor
quickly changed, Miller testified. Delgado informed Miller that Pineda would have alibi
evidence because he "wasn't even there." Delgado then said, "I can't see evidence
links me there." He concluded, "I don't believe you have evidence to link me to the
scene." 

B. Accomplice Testimony

 Martinez testified at trial and implicated Delgado, Salazar, and Anzualda in
Vasquez's murder, along with himself. He told the jury that all four men were
members of the cadre. Martinez described Delgado as a "ranking member" whose
orders he was required to follow by the cadre's code of discipline. 

 On March 31, 2000, about 8:00 a.m., Martinez told the jury, Delgado, Salazar,
and Anzualda came to his home. They appeared drunk and high on cocaine. They
decided to go to Port Lavaca to see Victor Villarreal, another member of the cadre. 
Martinez knew federal authorities were looking for him and did not want to risk being
pulled over. He insisted on driving. Martinez drove Delgado, Salazar, and Anzualda
to Port Lavaca in his mother's Cadillac. 

 The men first tried to find Villarreal, who was not home. Searching next for
Vasquez, they looked up Hisquierdo, who showed them where Vasquez lived. They
dropped Hisquierdo back home and returned to Vasquez's house. Delgado and
Anzualda got out of the Cadillac. Delgado went to the front door. He asked for
Vasquez. Martinez testified he knew "something was going to get done and usually
if somebody gets picked up by the [cadre] or if a job has to be done, [cadre] members
don't go knocking on the door themselves, exposing [themselves] like that in broad
daylight." Anzualda returned to the car. Salazar got out. Meanwhile, Vasquez came
out of the house and spoke with Delgado. After going back inside and changing
clothes, Vasquez got in the back seat of the Cadillac. It was about 9:45 a.m. They
stopped at a convenience store for gas. Anzualda bought beer. 

 Martinez drove toward Magnolia Beach. On the way, he testified, Delgado tore
a piece off the beer carton and wrote a note to Martinez, telling him to go "somewhere 
to take the body, to get rid of the body." 

 They arrived at the LaSalle Monument about 10:00 or 10:15. Martinez parked
the Cadillac near a park bench. The five men got out of the car. They drank some
more and talked. Delgado and Anzualda went into the bushes, then returned. 
Martinez decided to move his mother's car away from the scene. The other men
walked to where he had moved the car anyway. Delgado distracted Vasquez's
attention toward the LaSalle Monument. He swung a beer bottle and tried to hit
Vasquez in the head. Vasquez put one hand up to block the blow. The other men
rushed Vasquez. Anzualda pulled a knife and attacked Vasquez. He stabbed Vasquez
repeatedly. Martinez kicked and punched Vasquez. 

 Vasquez pleaded for his life. Delgado said to get Vasquez's wallet. Martinez
handed Delgado the wallet. When Vasquez lost consciousness, Martinez and Anzualda
dragged the body toward the rocks. Vasquez regained consciousness. Martinez
punched him. Vasquez fell again. Salazar started stabbing him repeatedly. Vasquez
lost consciousness again. 

 The men pulled Vasquez into the bushes. Delgado insisted they could not leave
the body there. He suggested they put Vasquez in the trunk of the Cadillac. Martinez
told the jury he refused. Delgado "went to go pull the body more so nobody could see
it, more to where nobody could see it." As Delgado did so, Martinez testified,
Vasquez "jumped up and he ran - I guess he tried to get away, but he ran toward -
going towards in [sic] the water." Salazar and Anzualda followed Vasquez. Salazar
stabbed Vasquez some more. Delgado shouted instructions from the beach, "Stab him
in the neck, cut his throat, stab him in the neck." 

 Salazar and Anzualda returned to shore. Vasquez remained on his feet in the
water. Martinez testified he convinced the others to leave, arguing that someone in
a passing car might see them. Delgado replied, "we can't leave him like that because
he's going to tell on all of us and he was going to rat us all out," Martinez told the
jury. Vasquez waded ashore. The four men got back in the Cadillac. As they were
leaving, Delgado said, "Stop the car, y'all [omitted] don't know how to do nothing
right, let me go show y'all how it's done." He got out of the car. He pulled the
butcher knife with the taped wooden handle from his waistband. 

 Delgado waded into the water, Martinez testified. He stabbed Vasquez twice
in the back. He grabbed Vasquez's hair and dragged his head under water. He quickly
slit the man's throat, then slit it again. He left Vasquez floating in the water. Back at the Cadillac, Delgado repeated to the other men that Vasquez had told
him, "Go ahead and kill me." Delgado said he replied, "Don't worry about it, you ain't
got to worry about that, that's what I'm going to do." 

 Delgado, however, proved no more successful than his cadre subordinates.
Vasquez did not die from being hit in the head with a beer bottle, beaten, stabbed, or
having his throat cut. Dr. Bayardo, the medical examiner, testified that Vasquez had
sustained a laceration to the back of his head, caused by blunt force, as well as
seventy-seven cuts and stab wounds throughout his body. His injuries included
slashes on his face and neck and multiple defensive wounds on his hands, forearms,
and one knee. Even so, Dr. Bayardo told the jury, the wounds would not have killed
Vasquez immediately. They would have taken about thirty minutes. Vasquez's
airways were packed with sand and particles of seashell and seawater, the medical
examiner testified. Vasquez did not bleed to death. He drowned. 

 Before they left, Martinez testified, Delgado instructed them to pick up all the
beer bottles, so they would not leave any fingerprints. They did so. 

 As they drove back to Victoria, Delgado asked if anybody got cut or was
bleeding. Salazar reported he had cut his finger when the knife he was using
accidently closed while he was stabbing Vasquez. Delgado told Salazar to wipe off
the knife Salazar had used, a green camouflage pull-out blade, and throw it out. 
Salazar threw the knife on the side of the road. Delgado also wiped off his knife and
threw it out. Anzualda noticed that he had lost his gold nugget bracelet in the
struggle. 

 Once a "job is done," Martinez told the jury, the usual practice of the cadre is
to get rid of clothes used in the commission of a crime by throwing them away in the
water or in a trash bag or by burning them. After Vasquez's murder, Delgado
instructed the participants to get rid of their clothes and shoes. He told Martinez to
"clean the car real good." 

 Martinez testified that after he got home that day, he took a shower. He stuffed
his shoes and clothes in a bag. He washed and vacuumed his mother's car. He threw
away all the beer bottles. Then he went fishing. On the way, he tossed the bag
containing the clothes he had worn that morning in a dumpster. 

 Martinez testified Delgado was wearing brown K-Swiss boots, cut-off khaki
Dickeys, and a cut-off white tee shirt the day they murdered Vasquez. Salazar was
wearing blue jeans and a brown shirt. Anzualda was wearing all white clothes. 
Martinez identified the partially burned boot retrieved by Goodwine as similar to the
boots Delgado wore that day. He identified other clothing retrieved from the burn site
as worn by Salazar and Anzualda on the day of the murder. 

 Martinez confirmed that Delgado was a sergeant in the cadre. He admitted he
was a member himself but held no rank. (5) Accordingly, Martinez testified, he took
orders from ranking members of the cadre such as Delgado. 

 Pineda was a lieutenant in the cadre, Martinez told the jury, but did not order
Vasquez's murder. "Everything that happened was on the orders of Jimmy Delgado,
because he was the ranking member," Martinez testified. 

 Anzualda and Salazar were not full members of the cadre, Martinez informed the
jury. Rather, they had been "picked up" by Delgado, the cadre's term for ranking
members' sponsorship of prospective recruits. Thus, Anzualda and Salazar also took
orders from Delgado. 

 On cross-examination, Martinez testified that Delgado once intended to "pick
up" Vasquez for membership in the cadre. Delgado became angry and changed his
mind when Vasquez did not pay the drug debt he owed Delgado. 

 Also on cross-examination, Martinez testified about the murder of a man named
Ray Hernandez. On the State's re-direct, Martinez testified that Delgado was present
when Hernandez was murdered. Delgado was charged with the murder. "Someone,"
Martinez alluded to the jury, wrote a letter to Delgado's attorney accepting
responsibility for the murder. The charges against Delgado were dismissed. Delgado's
counsel asked Martinez: 

 [Defense Counsel]: I do recall that you talked about Mr. Delgado having
been charged on another murder, and I believe you mentioned that some
other party wrote a letter or signed an affidavit about that murder and the
charges against Mr. Delgado were dismissed. . . . Now, is that common
practice or a procedure with the [cadre], that if a party commits -one of
your members commits a crime and one of the other members gets
charged for that crime, is it common or policy that the member that was
actually involved would write a letter or write an affidavit? 


 [Martinez]: The reason - the reason why the letter was written and
given to the lawyer that Jimmy Delgado had was because Jimmy
Delgado had picked up that individual into the [cadre], and I guess he did
it as a favor to Jimmy. But, no, it's not usually . . . done." 


 [Defense Counsel]: - is it true, then in the [cadre] that the person who
recommends a person to become a member is responsible for that
member's actions?


 [Martinez]: Yes. . . . That's true.


 [Defense Counsel]: So, in the case of if Jimmy Delgado had
recommended that person, there was a responsibility, according to the
[cadre] rules and regulations, that Jimmy Delgado would have been
responsible for having recommended that person in the first place, right?


 [Martinez]: But . . . it works the other way around, too, that the
individual he picks up is also responsible for taking care of him.

 During re-direct examination of Martinez, the State offered in evidence a letter (6)
Delgado wrote to Salazar while in jail. The trial court, over Delgado's objection,
admitted the letter: 

 Mad Matt 9-13

 Say Lolo Meskin, that hair grease was spilled on my whole tablet
foolio! I wash my hands before I write I wouldn't be able to hold on to
my pencil! HaHa Meskin, L.L. passed my ruca a big 50 for me and I told
her to pass some to feo (7) pero feos dad shot her some scratch so I told
her to shoot that [illegible] to you. Your future bride HaHa was on the
other line and said she was gonna send you some $$$ so Lisa shot me
the whole 50. Damn meskin, don't tell me Corky didnt send you nada or
Ill have to take her teeth with a monkey wrench. HaHa


 Meskin, I seen my lawyer today dude. He said the D.A. wants to
crank my case up from Murder 1 to capital murder. Shees. Nohombre
dude. That [expletive] wants the death penalty. [Expletive.] They don't
have no physical evidence on me yet meskin. I got that [illegible]
autopsy. It said he was stabbed 77 times & drowned. They found a big
knife with wooden handle but no blood was on it. There was a blood
stain on my diamond ring but all my other jewelry was clean. It said no
dna was taken on my ring so I don't know if they havent done it yet or
they cant do it. Your Blood and DNA was matched in MD Back car door,
and I just wanted you to know. They didnt get [expletive] from the first
finger nail clippings but theirs suppose to be a [expletive] load of more
stuff getting tested. I got a list of all the [expletive] they tested the first
time & it was 80 things. Sheez. They found a nugget bracelet with
blood all over it. My lawyer said theyll set discovery for me for late
November and trial for late January but if I get reindicted for capital
murder then itll be even longer. He said you havent been given a lawyer
yet. I guess you'll see who it will be on Oct 3rd. I told my lawyer that
you & feo will testify for me huh. He said not to trust you & feo cause
when it comes down to it everybody will be out for themselves. I told
that fool that I would rather go to court by my damn self if he didnt
believe me cause I know yall meskins will handle up like you said and let
the truth come out. I told him I trust yall meskins with my life. Now he
wants me to sit back and write down every single thing that happened
that day. Its time to get the ball rolling. Let me see if I can get copies
of the things my lawyer sent me. If lisa comes up here Saturday Ill
release my papers to her and have her get you & Ugly copies of what I
got OK. If she don't come Ill just send you my [expletive] Monday but
you got to shoot it back when your done ok. What I want you to do bro
is to do what I do & write down everything you remember from that day
eh. Start from 700 at Fermin's and go from there. Remember that we
got to PL before 9 & when yall dropped me off & pick up ugly & went
back. Write it all down bro and shoot it to my lawyer. Its just so he will
know what you'll testify too for me and It will show him the light on
MD's [expletive] so he can start putting [expletive] together to smash
that hoe [expletive] meskin head against a rock. Tell em straight up that
you wanted nada to do with it but that [expletive] threatened you ok. 
Then after it was all said and done I went over around 1230 & learned
what all happened . . . . I just talked to Lisa. Corky said not to send you
$ because she was gonna send $. You can call 5790407. Its for F&T&
me. Lisa will get my copies to you & ugly. Orale bro. Much Love
meskin and thanks for staying true. Con un abrazo de puro carnalismo. 
JD.


 PS I wasnt breaking ICE Bro. Eye flor. HaHaHa


 Get back to me

 soon bro. The ball 

 is finally rolling . . 


 Elliot Costas Attorney at Law

 115 S. Main St. 2nd Floor

 Victoria Tx 77901


 Delgado then sought to introduce letters written by Salazar and Anzualda. All
three letters stated that Delgado was not a participant in Vasquez's murder. 
Anzualda's letter confessed his part in Vasquez's murder and implicated both Martinez
and Salazar as participants. The trial court sustained the State's objections to the
letters. 

 Finally, Martinez testified that a man named Gilbert Vasquez (apparently no
relation) also was murdered because he owed money to Delgado. Martinez told the
jury that Delgado was present during that murder, too. 

III. DISCUSSION

A. The State's Alleged Failure to Disclose Exculpatory Evidence 

 In his first issue, Delgado asserts he was denied a fair trial by the State's
violations of Brady v. Maryland, 373 U.S. 83 (1963). Specifically, Delgado complains
the State was required to disclose to him: (1) a family relationship between witness
Laura Villarreal and Raymond Hinojosa, Jacqueline Hinojosa, and April Hinojosa; (2) a
family relationship between the same witness and Victor Villarreal, who was the other
man Delgado went to Port Lavaca to see the morning of March 31, 2000; and
(3) reports prepared by the FBI. Delgado argues that the State's failure to disclose
information to him prevented him from locating several key witnesses, including Victor
Villarreal, Hisquierdo, Pineda, and a woman named Anna Gomez Maseda. Finally,
Delgado also claims that the State failed to make available to the defense witnesses
who could have testified Delgado was in Victoria at the time of Vasquez's murder. 

1. The Record


 Delgado filed a motion for discovery requesting the names and addresses of
persons interviewed by the State, those having personal knowledge of the alleged
offense, witnesses the State intended to call to testify, or others involved in the
investigation. He asked for any and all oral and written statements taken from any
party or witness. He also filed a motion for evidence favorable to him, seeking an
order: (1) requiring the prosecution to disclose all exculpatory evidence that the
prosecution may have had in its possession; (2) requiring the prosecution to tender its
investigative file to the trial court for in camera review and a determination of what
evidence was exculpatory; and (3) sealing that portion of the prosecution's file not
found by the trial court to be exculpatory. Delgado also filed a motion for production
of witness statements. He requested an order that the prosecution and all law
enforcement agencies and agents involved in any material way to disclose the names
and addresses of persons with direct or indirect knowledge of information material to
guilt or punishment. 

 The trial court held a pretrial hearing. The State and defense counsel announced
they had reached an agreement regarding discovery. The State agreed to comply with
Brady but opposed in camera review of its file. The trial court denied Delgado's
request to order the State to tender the entire file for in camera review but granted the
rest of Delgado's Brady motion. The court then considered Delgado's motion for pre-trial discovery. The State and defense counsel announced the following agreement:

 THE STATE: I don't believe that we have agreed to provide a summary
of testimony of what these witnesses -


 [DEFENSE COUNSEL]: Okay, well, statements -


 THE STATE: The name of the witnesses, yes.


 [DEFENSE COUNSEL]: -as well as their statements, potentially, as
required -


 THE STATE: We haven't agreed to provide statements; although, we
would have, you know, statements certainly available, you know, at time
of trial. You know, it may be possible to provide you with some
statements well in advance of trial, but we haven't agreed to provide any
statements at this point.


 [DEFENSE COUNSEL]: All right, sir.


 THE STATE: Other than the names of witnesses under the stipulation
that their address, phone number, et cetera, you know, would not be
disclosed.


 [DEFENSE COUNSEL]: And these people, at the Defense's request,
would be available to be interviewed at the District Attorney's office at
a mutually convenient time.


 THE STATE: Correct. Correct.


 [DEFENSE COUNSEL]: With regards to, again, paragraph 3, arabic
numeral two, the names of persons the prosecution will call to testify
during the presentation of rebuttal evidence, the names of such people
will be provided to the Defense at the very earliest possible time.


 THE STATE: We anticipate that would be, of course, during trial after it
is determined that rebuttal testimony would be presented, Your Honor. 


 THE COURT: After the presentation of the Defense's case-in-chief?


 THE STATE: Correct, Your Honor.


 THE COURT: That sounds right to me.


 [DEFENSE COUNSEL]: The names of all persons present at the scene of
the crime alleged in the indictment herein at the time of the alleged
offense.


 THE STATE: We agree to provide that.


 [DEFENSE COUNSEL]: And, then, with regards to the names of persons
interviewed by law enforcement agents at the scene after the alleged
crime, the State has agreed to provide the names of the people who
found the victim.


 THE STATE: That's correct:


 [SECOND PROSECUTOR]: Your Honor, if I may, with regard to any of
these portions of the Discovery Motion regarding identification of
witnesses or individuals at the scene, we would ask for the same
consideration as previously stated; that is, that the State not be required
to disclose the address, location, telephone numbers, et cetera, of the
witness.


 [DEFENSE COUNSEL]: Yes, sir.


 THE COURT: Right. My understanding is the law does not require that
you provide that information. If that creates a problem for the Defense-


 [DEFENSE COUNSEL]: Right.


 THE COURT: - you can come back to the Court with a specific motion
on specific witnesses and so that the Court can review that-


 [DEFENSE COUNSEL]: Yes, sir.


 THE COURT: -for the possibility that there may be some relief that
would be available to you.


 [DEFENSE COUNSEL]: Subject to some change in circumstances, Your
Honor, I consider that a running part of our agreement, sir.


 THE COURT: All right. 


 The agreement that the State would not provide addresses and telephone
numbers was repeated later in the hearing:


 THE STATE: That being that we will not provide these to you.


 [DEFENSE COUNSEL]: That's correct. Yes. sir.


 At a second pretrial hearing, Delgado requested an order requiring the
transcription of the first pre-trial proceeding, which the trial court granted. Discussions
of Brady requests ended with the State agreeing to comply with Brady. Defense
counsel asked the trial court to order the State to transcribe Maseda's grand jury
testimony and that of Delgado's wife, Lisa Alvarez. The State agreed to transcribe the
testimony. It opposed giving the transcripts to defense counsel but agreed to provide
them to the trial court for review. The trial court ordered, "I think that's a good idea. 
Have it transcribed and available and then we'll see at the time of trial." Defense
counsel added, "At the time of trial whether it's necessary." 

2. Standard and Scope of Review


 The primary duty of all prosecuting attorneys is to see that justice is done, not
merely to seek convictions. Tex. Code Crim. Proc. Ann. art. 2.01 (Vernon
Supp. 2003). Prosecutors are prohibited from suppressing facts or secreting
witnesses who may establish the innocence of the accused. Id. A defendant in a
criminal case must be granted a new trial when evidence tending to establish the
defendant's innocence has been intentionally withheld, thus preventing its production
at trial. Tex. R. App. P. 21.3(e). The State violates the Due Process Clause of the
Fourteenth Amendment when a prosecutor fails to disclose evidence favorable to the
accused that creates a probability sufficient to undermine confidence in the outcome
of the proceeding. Thomas v. State, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). 
Where the trial court grants a motion for discovery, and the State fails to disclose
evidence ordered disclosed by the trial court, the evidence should not be admitted if
it is offered by the State during the trial. Lindley v. State, 635 S.W.2d 541, 543
(Tex. Crim. App. [Panel Op.] 1982). 

 Our review of a prosecutor's alleged failure to disclose exculpatory evidence
requires us to: (1) employ a materiality standard rather than a constitutional harmless-error standard in evaluating the evidence; and (2) determine the materiality of the
evidence in light of all other evidence properly introduced at trial. Hampton v. State,
86 S.W.3d 603, 612 (Tex. Crim. App. 2002). We consider any adverse effect that
the prosecutor's non-disclosure might have had on the preparation or presentation of
the accused's case. Thomas, 841 S.W.2d at 405. We assess the possibility that an
adverse effect might have occurred in light of the totality of the circumstances and
with an awareness of the difficulty of reconstructing in a post-trial proceeding the
course that the defense and the trial would have taken had the defense not been
misled by the prosecutor's failure to disclose. Id. To make this determination, we
examine the alleged error in the context of the overall strength of the State's case.  Id. 
3. The Law Applicable to the State's Duty to Disclose Exculpatory Evidence


a. Preservation of Error


 With limited exceptions, a party must timely present a complaint to the trial
court and obtain a ruling on the request, objection, or motion to preserve the complaint
for appellate review. Tex. R. App. P. 31.1. However, when the State's failure to
disclose Brady material is discovered during trial, the accused is entitled to a recess to
obtain production of the material, even if the defense did not make pretrial efforts to
obtain it. Crawford v. State, 892 S.W.2d 1, 4 (Tex. Crim. App. 1994). Nonetheless,
the accused then must request a postponement or seek a continuance. Otherwise, the
accused waives any complaint of surprise in the State's failure to disclose the material
earlier. Lindley, 635 S.W.2d at 544; Zule v. State, 802 S.W.2d 28, 33 (Tex.
App.-Corpus Christi 1990, pet. ref'd). 

b. The Criteria for Disclosure


 A Brady violation occurs if: (1) the State failed to disclose evidence, regardless
of the prosecution's good or bad faith; (2) the withheld evidence is favorable to the
defendant; and (3) the evidence is material, that is, there is a reasonable probability
that had the evidence been disclosed, the outcome of the trial would have been
different. Ex parte Richardson, 70 S.W.3d 865, 870 (Tex. Crim. App. 2002);
Thomas, 841 S.W.2d at 404. The prosecution has no duty to turn over evidence not
in its possession or not known to exist. State v. Blanco, 953 S.W.2d 799, 802-03
(Tex. App.-Corpus Christi 1997, pet. ref'd) (citing Hafdahl v. State, 805 S.W.2d 396,
399 n. 3 (Tex. Crim. App. 1990)). The prosecution does have a duty to learn of any
favorable evidence known to others acting in the case on the State's behalf, including
the police. Blanco, 953 S.W.2d at 802-03 (citing Kyles v. Whitley,
514 U.S. 419, 419 (1995)). 

 Favorable evidence is any evidence, if disclosed and used effectively, that may
make the difference between conviction and acquittal. Thomas, 841 S.W.2d at 404. 
Favorable evidence includes both exculpatory and impeachment evidence. Wyatt v.
State, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); Thomas, 841 S.W.2d at 404. 
Exculpatory evidence is that which tends to justify, excuse, or clear the accused of 
fault or guilt. Id. Impeachment evidence is that which disputes, disparages, denies,
or contradicts a witness's testimony. Id. Evidence is material if it creates a probability
sufficient to undermine confidence in the outcome of the proceeding. Id. 

 Thus, to prevail on a Brady claim, an appellant must show that the State's
nondisclosure or tardy disclosure prejudiced the defense. Little v. State,
991 S.W.2d 864, 867 (Tex. Crim. App. 1999). To show prejudice, an appellant must
show a reasonable probability that the result of the proceeding would have been
different had the State timely disclosed the evidence to the defense. Id. at 866. 

4. Brady Analysis


a. Waiver


 At the conclusion of the first pretrial discovery hearing, the trial court invited the
defense to file a specific motion on specific witnesses so the trial court could review
the matter "for the possibility that there may be some relief that would be available." 
The defense agreed. In addition, the trial court granted defense counsel's request for
a transcription of grand jury testimony and ordered that the State make the transcript
available to the defense "at the time of trial." Thus, the trial court provided the
defense with the opportunity to revisit Brady issues. Delgado did not do so during the
trial. Delgado's failure to re-urge his discovery requests during trial forfeited any
claimed error. See Tex. R. App. P. 31.1. 

 As to the FBI reports Delgado claims were withheld, he did not include them in
the record. In any event, Delgado requested a copy of one report before cross-examining one of the federal agents. See Tex. R. Evid. 615. The trial court ordered
the State to produce the report. The State did so. The trial court allowed defense
counsel time to review the report before proceeding with the cross-examination. See
Tex. R. Evid. 615(d). Delgado did not seek a continuance. Assuming, without
deciding, that the report was exculpatory and material, Delgado's failure to move for
a continuance also waived any claim he was surprised by the report. See Lindley,
635 S.W.2d at 544; see also Zule, 802 S.W.2d at 33. If the State withheld other
reports from the defense, we cannot conclude on this record whether they were 
exculpatory or material. See Hampton, 86 S.W.3d at 605.

 Finally, the record does not establish how the State prevented the defense from
locating key witnesses. Nor did Delgado develop a record of what witnesses the
defense failed to make available to him who could have testified Delgado was in
Victoria, Texas at the time of the murder. On this record, we are unable to determine
the materiality of the allegedly withheld evidence. See Hampton , 86 S.W.3d at 605. 

 b. Evidence of Familial Relationships


 At trial, Laura Villarreal testified that Raymond Hinojosa is her nephew, making
her related to his sisters April and Jacqueline Hinojosa as well. Delgado did not seek
a postponement or continuance when the information surfaced during Laura Villarreal's
testimony. Assuming, without deciding, that the information was exculpatory and
material, Delgado's failure to move for a continuance also waived any claim he was
surprised by the information. See Lindley, 635 S.W.2d at 544; see also Zule,
802 S.W.2d at 33. In any event, the record does not show that the prosecutor knew
about the relationship. Finally, Laura Villarreal's testimony was limited to placing a
dark-colored Cadillac en route to Indianola immediately before Vasquez's murder. 

 Whatever impeachment value information of a family relationship between Laura
Villarreal and the Hinojosas may have had, other witnesses testified they saw a dark-colored Cadillac at the beach where the murder occurred. We find, in light of the other
evidence introduced at trial, that Delgado did not meet his burden of establishing the
materiality of evidence of a family relationship between Laura Villarreal and the
Hinojosa family. See Hampton, 86 S.W.3d at 605. Similarly, we also find that
Delgado did not meet his burden of showing a reasonable probability that the result of
the proceeding would have been different had evidence of a family relationship
between Laura Villarreal and the Hinojosa family been disclosed to the defense earlier. 
See Little, 991 S.W.2d at 866. 

 Further, the record does not establish any family relationship between Laura
Villarreal and Victor Villarreal. During cross-examination, defense counsel asked
Martinez, "Okay. Isn't it true that Victor Villarreal has a relative living in Port Lavaca
by the name of Laura Villarreal?" Martinez answered, "I don't know." Thus, we find
that Delgado did not establish on the record that Laura Villarreal and Victor Villarreal
were related, much less that the prosecutor knew about any relationship and failed to
disclose it to the defense. See Zule, 802 S.W.2d at 33. We find that Delgado did not
meet his burden of proving that the State failed to disclose evidence favorable to him
with regard to any family relationship between Laura Villarreal and Victor Villarreal. 
See Ex parte Richardson, 70 S.W.3d at 870; see also Thomas, 841 S.W.2d at 404. 

 Accordingly, even if Delgado had preserved the Brady errors he claims on
appeal, we conclude he did not meet his burden of showing that the State withheld
evidence favorable to him or that there is a reasonable probability that the outcome of
the trial would have been different had the evidence been disclosed. See Ex parte
Richardson, 70 S.W.3d at 870. We overrule Delgado's first issue. 

B. Admission and Exclusion of Evidence


 In his second issue, Delgado asserts the trial court abused its discretion in
admitting his letter to Salazar into evidence. He also complains of the trial court's
exclusion of Salazar and Anzualda's letters. 

1. Waiver


 By introducing otherwise inadmissible matters into evidence, a party "opens the
door" and invites the other side to reply. McKee v. State, 855 S.W.2d 89, 92 (Tex.
App.-Houston [14th Dist.] 1993, no pet.) (citing Kincaid v. State, 534 S.W.2d 340,
342 (Tex. Crim. App. 1976)). Opening the door waives any complaint in the
admission of evidence introduced in reply. McKee, 855 S.W.2d at 92. 

 Further, a party complaining on appeal about the trial court's admission,
exclusion, or suppression of evidence "must, at the earliest opportunity, have done
everything necessary to bring to the judge's attention the evidence rule [or statute] in
question and its precise and proper application to the evidence in question." Tex. R.
App. P. 33.1; Martinez v. State, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002). This
"raise it or waive it" waiver rule applies equally to the State and the accused. 
Martinez, 91 S.W.3d at 336. 

2. Standard of Review


 We review a trial court's admission or exclusion of evidence under an abuse-of-discretion standard. Montgomery v. State, 810 S.W.2d 372, 379-80 (Tex. Crim.
App. 1990). The abuse-of-discretion standard applies to our review of a trial court's
admission or exclusion of hearsay evidence. See Cunningham v. State,
877 S.W.2d 310, 313 (Tex. Crim. App. 1994) (excluding admission against interest). 
An abuse of discretion occurs when the trial court acts arbitrarily or unreasonably,
without reference to guiding rules or principles. Montgomery, 810 S.W.2d at 380. 
In other words, an abuse of discretion occurs only when the trial court's decision is
so wrong as to lie outside that zone within which reasonable persons might disagree. 
Id. A trial court has a "limited right to be wrong." Our inquiry on appeal is whether the
result was reached in an arbitrary or capricious manner. Id. Therefore, we uphold a
trial court's evidentiary ruling if it is reasonably supported by the record and is correct
under any theory of law applicable to the case. State v. Ross,
32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000); Jones v. State,
833 S.W.2d 118, 125 n. 15 (Tex. Crim. App. 2002). We do not reverse a trial
court's evidentiary ruling on a theory of admissibility or inadmissibility not raised at
trial. Martinez v. State, 91 S.W.3d 331, 336 (Tex. Crim. App. 1992). 

3. The Law Applicable to Evidentiary Rulings

 To be admissible, evidence must be relevant. Tex. R. Evid. 402. Relevant
evidence is evidence having any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable than
it would be without the evidence. Tex. R. Evid. 401. Although relevant, evidence
may be excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, misleading the jury, by considerations of
undue delay, or needless presentation of cumulative evidence. Tex. R. Evid. 403;
Mozon v. State, 991 S.W.2d 841, 846-47 (Tex. Crim. App. 1999). In other words,
rule 403 favors the admission of relevant evidence and carries the presumption that
relevant evidence will be more probative than prejudicial. Phelps v. State,
5 S.W.3d 788, 795 (Tex. App.-San Antonio 1999, pet. ref'd). In reviewing the trial
court's balancing of probative value with prejudice, we reverse the trial court's
judgment "rarely and only after a clear abuse of discretion." Phelps, 5 S.W.3d at 795
(citing Montgomery, 810 S.W.2d at 379). 

4. Evidentiary Analysis


a. Waiver


(1) Admission of Delgado's Letter

 The State moved to admit Delgado's letter only after the defense questioned
Martinez about the practice within the cadre of providing letters or affidavits
exculpating one another. Delgado objected to the admission of the letter, asserting:
(1) its contents were irrelevant and immaterial; (2) any probative value was
substantially outweighed by the danger of unfair prejudice or misleading the jury; (3) it
contained attorney-client communications; and (4) it contained language that the jurors
might consider vulgar. The trial court overruled the objection and permitted the State
to introduce Delgado's letter. In doing so, the State did not stray beyond the scope
of Delgado's invitation. See McKee, 855 S.W.2d at 92. We hold that Delgado waived
any complaint in the trial court's admission of the letter by "opening the door" and
inviting the State to reply to evidence of the cadre's practices that Delgado elicited
first. See id. 

(2) Exclusion of Salazar's Letter

 The defense offered in evidence letters attributed to Salazar and Anzualda that
exculpated Delgado and inculpated Martinez as well as themselves. The defense
initially offered the letters to "identify the handwriting" of Anzualda and Salazar. (8) The
State objected without stating a reason. The trial court sustained the objection. The
defense re-offered the letters, urging they contained "statements against interest
against the co-defendants and contain information relative - exculpatory to the
defendant in this case." The State objected again, this time asserting that the letters
were contradictory, unreliable, inconsistent, and not trustworthy. The State argued
that they were written at Delgado's prompting and contradicted each other. The
defense countered that the letters were admissible as exceptions to the hearsay rule. 
See Tex. R. Evid. 801(e). The defense then withdrew the offer of Salazar's letter. 
Accordingly, we hold that Delgado waived at trial any complaint in the trial court's
exclusion of Salazar's letter. See Martinez, 91 S.W.3d at 335. 

(3) Exclusion of Anzualda's Letters


 The trial court sustained the State's objection to Anzualda's letters and ruled
that they were inadmissible for two reasons: (1) they were unreliable, particularly in
light of evidence of the cadre's "one for all and all for one" practice in "accordance
with the constitution" of the cadre (9); and (2) Anzualda was called to testify by the
defense and, after the court allowed him the opportunity to confer with his attorney,
elected not to testify. Among other arguments on appeal, Delgado challenges the trial
court's exclusion of Anzualda's letters on the basis that he offered them to prove that
the statements were made, not to prove the truth of what was said in them. See Tex.
R. Evid. 801(d). He also contends that the letters were necessary both to impeach the
State's witnesses and to exculpate Delgado and were admissible under the doctrine
of optional completeness. See Tex. R. Evid. 107. Delgado did not present to the trial
court the arguments he makes on appeal in support of the admissibility of Anzualda's
letters. We cannot reverse a trial court's exclusion of evidence on a theory of
admissibility not presented to it. See Martinez, 91 S.W.3d at 337. We hold that
Delgado waived on appeal his objection to the trial court's exclusion of Anzualda's
letters. 

b. The Admissibility of Delgado's Letter


 Even assuming Delgado preserved any error in the admission of his letter, we
find that Delgado's letter was relevant and probative of his knowledge of details of
Vasquez's murder. It was not unfairly prejudicial, nor did it confuse the issues,
mislead the jury, or needlessly present cumulative evidence. See Tex. R. Evid 403; 
see also Phelps, 5 S.W.3d at 795. We hold that the trial court did not abuse its
discretion in admitting Delgado's letter. See id. 

c. The Inadmissibility of Anzualda's Letters


 Even assuming Delgado preserved any error in the exclusion of Anzualda's
letters, we find that the record contains ample support for the trial court's conclusion
that the letters were unreliable. The evidence was undisputed that "Friends are friends
and friends stick together," as Delgado admitted during his videotaped statement. 
Moreover, Martinez testified that Delgado's subordinates within the cadre and
prospective recruits he "picked up" were required to follow Delgado's orders. Martinez
testified that Delgado had "picked up" Anzualda and Salazar. Thus, Delgado's letter
to Anzualda and Salazar, which undeniably instructed them to testify on his behalf, is
consistent both with evidence of the cadre's "all for one and one for all" organizational
tenets and the demands of its hierarchical command structure. Finally, from defense
counsel's cross-examination of Martinez, the jury learned that murder charges in
another case had been dismissed against Delgado when "someone" wrote a letter
exculpating Delgado for another murder at which Delgado was present. We conclude
that the trial court's exclusion of Anzualda's letters is reasonably supported by the
record. See Ross, 32 S.W.3d at 855-56. We hold that the trial court did not abuse
its discretion in excluding Anzualda's letters. See id. 

 We find no evidentiary error. We overrule Delgado's second issue. 

C. Denial of Delgado's Motion for Directed Verdict and Sufficiency Challenges

 In his third issue, Delgado asserts that the trial court erred in denying his motion
for directed verdict. Excluding Martinez's testimony, Delgado adds, there is no
evidence that Delgado was at or near Magnolia Beach on the day of the murder. 
Delgado concludes that the overwhelming weight of the evidence is such that the
verdict is clearly wrong and unjust. We construe Delgado's brief liberally, as we must,
and conclude that he also raises a challenge to the legal and factual sufficiency of the
evidence to support his conviction. See Tex. R. App. P. 38.9. 

1. Standards of Review


(a) Legal Sufficiency


 A challenge on appeal to the denial of a motion for directed verdict is a
challenge to the legal sufficiency of the evidence. Williams v. State,
937 S.W.2d 479, 482 (Tex. Crim. App. 1996). A legal-sufficiency challenge calls on
us to review the relevant evidence in the light most favorable to the verdict. Jackson
v. Virginia, 443  U.S. 307, 319 (1979); Swearingen v. State, 101 S.W.3d 89, 95
(Tex. Crim. App. 2003); Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). 
We consider all the evidence that sustains the conviction, whether properly or
improperly admitted. Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001)
(citing Garcia v. State, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994)). Similarly, we
consider all the evidence that sustains the conviction, whether submitted by the
prosecution or the defense, in determining the legal sufficiency of the evidence. Cook
v. State, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993). The legal sufficiency of the
evidence is measured against the elements of the offense as defined by a
hypothetically correct jury charge for the case. Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997). This standard of legal sufficiency ensures that a judgment
of acquittal is reserved for those situations in which there is an actual failure in the
State's proof of the crime rather than a mere error in the jury charge submitted. Id. 
We then determine if any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319; Johnson,
23 S.W.3d at 7. 

 If we reverse a criminal case for legal insufficiency, we reform the judgment of
conviction to reflect conviction for a lesser offense only if a jury charge on the lesser
offense was either submitted or requested but denied. Collier v. State,
999 S.W.2d 779, 782 (Tex. Crim. App. 1999). Otherwise, we vacate the judgment
of conviction for legal insufficiency and order a judgment of acquittal. Swearingen,
101 S.W.3d at 95. 

(b) Factual Sufficiency


 We are constitutionally empowered to review the judgment of the trial court to
determine the factual sufficiency of the evidence used to establish the elements of the
offense with which Nuñez was charged. See Johnson, 23 S.W.3d at 6. In
determining the factual sufficiency of the elements of the offense, we view all the
evidence neutrally, not through the prism of "the light most favorable to the
prosecution." Id. at 6-7 (citing Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim.
App. 1996)). We set aside the verdict only if it is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust. Id. at 7. A clearly wrong
and unjust verdict is "manifestly unjust," "shocks the conscience," or "clearly
demonstrates bias." Rojas v. State, 986 S.W.2d 241, 247 (Tex. Crim. App. 1998). 
In conducting a factual-sufficiency review, we review the fact finder's weighing of the
evidence. Johnson, 23 S.W.3d at 7 (citing Clewis, 922 S.W.2d at 133). We review
the evidence weighed by the jury that tends to prove a material disputed fact and
compare it with evidence that tends to disprove it. Johnson, 23 S.W.3d at 7. We are
authorized to disagree with the fact finder's determination. Id. However, we approach
a factual-sufficiency review with appropriate deference to avoid substituting our
judgment for that of the fact finder. Id. Our evaluation should not intrude
substantially on the fact finder's role as the sole judge of the weight and credibility
given to witness testimony. Id. 

 We always remain aware of the fact finder's role and unique position, a position
we are unable to occupy. Id. at 9. Exercise of our authority to disagree with the fact
finder's determination is appropriate only when the record clearly indicates our
intervention is necessary to stop manifest injustice. Id. Otherwise, we accord due
deference to the fact finder's determinations, particularly those concerning the weight
and credibility of the evidence. Id. Absent exceptional circumstances, issues of
witness credibility are for the jury, and we may not substitute our view of the
credibility of a witness for the constitutionally guaranteed jury determination. Id. 

 Every fact need not point directly and independently to the accused's guilt. 
Vanderbilt v. State, 629 S.W.2d 709, 716 (Tex. Crim. App. 1981). A conclusion of
guilt can rest on the combined and cumulative force of all the incriminating
circumstances. Id. We reverse a judgment of conviction only if proof of guilt is so
obviously weak as to undermine confidence in the jury's determination, or proof of
guilt, although adequate if taken alone, is greatly outweighed by contrary proof. 
Swearingen, 101 S.W.3d at 97. 

 In conducting a factual sufficiency review in an opinion, we "show our work"
when we consider and address the appellant's main argument for urging insufficiency
of the evidence. Tex. R. App. P. 47.1; Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim.
App. 2003); Manning v. State, No. 14-02-0892-CR, 2003 Tex. App. LEXIS 6371,
at *16 (Houston [14th Dist.] July 24, 2003, no pet. h.). This practice benefits the
parties, maintains the integrity of the justice system, and improves appellate practice. 
Sims, 99 S.W.3d at 603; Manning, 2003 Tex. App. LEXIS 6371, at *16. 

 If we reverse a criminal case for factual insufficiency, we vacate the judgment
of conviction. Clewis, 922 S.W.2d at 133-34. We remand for a new trial a criminal
case reversed for factual insufficiency so a second jury has the chance to evaluate the
evidence. Swearingen, 101 S.W.3d at 97. 

2. The Law Applicable to the Sufficiency Analyses in This Case


(a) The Hypothetically Correct Charge

 A hypothetically correct charge is one that accurately sets out the law, is
authorized by the indictment, does not unnecessarily increase the State's burden of
proof or restrict its theories of liability, and adequately describes the particular offense
for which the defendant was tried. Malik, 953 S.W.2d at 240. With sufficient
evidence of Delgado's participation in the planning and commission of Vasquez's
murder, the indictment supported a jury instruction on the law of parties without a
parties allegation in the indictment. (10) See Goff v. State, 931 S.W.2d 537, 544 n.5
(Tex. Crim. App. 1996). In determining whether an accused participated as a party
in an offense, a fact finder may examine the events occurring before, during, and after
the commission of the offense and rely on actions of the accused that show an
understanding and common design to commit the offense. Hanson v. State,
55 S.W.3d 681, 690 (Tex. App.-Austin 2001, pet. ref'd). Thus, conviction was
authorized under the evidence in this case if a rational jury could find that Delgado
intentionally caused Vasquez's death, either as a principal or as a party. See Tex.
Code Crim. Proc. Ann. §19.02(b)(1) (Vernon 2003); see also Hanson, 55 S.W.3d
at 690. 

 (b) Corroboration of Accomplice Testimony


 An accomplice is a person who participates in an offense before, during, or after
its commission to the extent that the person can be charged with the offense or with
a lesser offense. Herron v. State, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002) (citing
Blake v. State, 971 S.W.2d 451, 454-55 (Tex. Crim. App. 1998)). A prosecution
witness indicted for the same offense as the accused is an accomplice as a matter of
law. Id. (citing Ex parte Zepeda, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991)). 

 As an accomplice, Martinez's testimony must be "corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the offense." Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 1979). We look for corroboration in all non-accomplice evidence, both prosecution and defense. Cook, 858 S.W.2d at 470. The
required corroborative evidence may be either circumstantial or direct and need not
directly link the accused to the crime. Richardson v. State, 879 S.W.2d 874, 880
(Tex. Crim. App. 1993); Reed v. State, 744 S.W.2d 112, 126 (Tex. Crim.
App. 1988). Further, the corroborating evidence need not establish guilt beyond a
reasonable doubt. Id. 

 Finally, "proof that the accused was at or near the scene of the crime at or
about the time of its commission, when coupled with other suspicious circumstances,
may tend to connect the accused to the crime so as to furnish sufficient corroboration
to support a conviction." Brown v. State, 672 S.W.2d 487, 489 (Tex. Crim.
App. 1984). Apparently insignificant incriminating circumstances may afford
satisfactory corroboration. Munoz v. State, 853 S.W.2d 558, 559 (Tex. Crim.
App. 1993). Evidence that an accused was in the company of the accomplice at or
near the time or place of a crime is proper corroborating evidence to support a
conviction. Hernandez v. State, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997). 

3. Sufficiency Analyses


 As is almost always the case, Delgado's intent must be established by
circumstantial evidence. See Dillon v. State, 574 S.W.2d 92, 94 (Tex. Crim. App.
[Panel Op.]1978). The jury may infer the requisite intent from Delgado's conduct. See
Conner, 67 S.W.3d at 197. 

(a) Legal Sufficiency


 The jury heard from non-accomplice witnesses that Vasquez had owed Delgado
a $300.00 drug debt for some time. Delgado himself admitted that Vasquez owed him
money. He admitted he may have been in Port Lavaca on March 31, 2000, the
morning of Vasquez's murder. He admitted that he looked for, found, and spoke with
Vasquez. He admitted that a second man and he drove Vasquez from Vasquez's home
in Port Lavaca to another location. 

 Non-accomplice witnesses testified that the morning of March 31, 2000,
Delgado drove up to Vasquez's home in a dark-colored Cadillac and parked in front. 
Delgado went to the door and announced he was Jimmy Delgado, Vasquez's "home
boy." Other non-accomplice testimony corroborated that Vasquez left with Delgado
in a dark Cadillac around 10:00 or 10:15 the morning of March 31. Meanwhile, about
10:00 or 10:30 that same morning, another non-accomplice witness noticed a dark-colored Cadillac on the way to Magnolia Beach. The car was not at the LaSalle
Monument a few minutes later. Shortly thereafter, however, other non-accomplice
witnesses in the vicinity of the LaSalle Monument saw three Hispanic men standing
near a Cadillac. By 11:49 a.m., Vasquez's girlfriend had reported him missing. 
By 1:13 p.m. the same day, Vasquez lay dead on the beach near the LaSalle
Monument. 

 Martinez assisted the authorities in recovering a knife that matched a description
Martinez gave them, where Martinez said they would find it. Martinez's testimony
connected Delgado to the knife. Forensic tests connected Salazar to blood found in
a dark-colored Cadillac in Martinez's possession six days after the murder. The
medical examiner's descriptions of Vasquez's injuries and manner of death
corresponded to Martinez's description of the murder. The scene of the crime, near
the LaSalle Monument, corresponded with Martinez's description of the location. 
Accordingly, we find that Martinez's testimony implicating Delgado as a principal in
Vasquez's murder is amply corroborated. See Hernandez, 939 S.W.2d at 178; see
also Munoz, 853 S.W.2d at 559; see also Brown, 672 S.W.2d at 489. 

 Finally, Delgado wrote a letter to two other men implicated in the murder in
which he observed that the State did not have any "physical evidence on [him] yet."
(Emphasis added.) Delgado admitted there "was a blood stain on [his] diamond ring
but all [his] other jewelry was clean." Considering only the evidence in favor of the
verdict, measured against a hypothetically correct jury charge on murder and the law
of parties, we find that any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. See Jackson, 443 U.S. at 319; see
also Johnson, 23 S.W.3d at 7. Accordingly, we hold that the trial court did not err in
overruling Delgado's motion for directed verdict. 

(b) Factual Sufficiency


 In addition to the evidence detailed above in support of the verdict, the jury also
heard, in Delgado's videotaped statement, that Delgado denied killing Vasquez. He
said Vasquez was alive when he dropped him off that day before returning to Victoria. 
He argues on appeal that the evidence shows a "lost hour" and corroborates his
version of events that he returned to Victoria before the murder was committed. 
However, that same videotaped statement reveals that Delgado knew that Pineda was
not involved in the murder. It also suggests that Delgado knew that four men were
involved. 

 The jury was free to place whatever value it wished on Delgado's own
statements. See Wesbrook, 29 S.W.3d at 112. It heard testimony throughout the
trial of witnesses who recalled what time key events occurred the morning of
March 31, 2000. The jury was free to reconcile any time discrepancies and disbelieve
Delgado's statement that he was in Victoria at the time of the murder. Moreover, the
jury was free to infer that Delgado, in his letter to Salazar and Anzualda, offered his
accomplices money for their exculpatory testimony. It also could have believed that
Delgado's letter to Salazar and Anzualda was a thinly veiled order to his "pick up"
recruits in the cadre to lie for him. The jury could have inferred consciousness of guilt
from these efforts by Delgado to secure perjured testimony. Further, the jury could
have inferred from Delgado's videotaped statement that he knew how many people
participated in Vasquez's murder and, from his knowledge that Pineda was not
involved in the murder, that Delgado knew who was. 

 Moreover, the jury learned that Delgado, Anzualda, and Salazar corresponded
with one another from jail as they awaited trial for Vasquez's murder. The jury read
Delgado's letter to Salazar regarding the events that preceded the murder. We find
that the jury could have inferred that Delgado's actions before, during, and after
Vasquez's murder showed an understanding of the offense as a party. See Hanson,
55 S.W.3d at 690. 

 Finally, while the jury heard evidence that Delgado would not have murdered
Vasquez for $50, it was free to infer that he would have done so or instructed others
to do so for $300 or to reinforce his authority within the cadre's hierarchy. Viewing
the relevant evidence in a neutral light, favoring neither the prosecution nor the
defense, and with appropriate deference to the jury's credibility determinations, we
conclude that the jury's verdict is not so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust. See Johnson, 23 S.W.3d at 6-7. 

 We hold that the evidence is legally and factually sufficient to support Delgado's
conviction. We overrule his third issue. 

IV. CONCLUSION

 We have overruled all three of Delgado's issues on appeal. We affirm the trial
court's judgment.


 ERRLINDA CASTILLO

 Justice




Do not publish. 

Tex. R. App. P. 47.2(b).


Opinion delivered and filed

this 28th day of August, 2003. 

1. See Tex. Pen. Code Ann. § 19.02(b)(1) (Vernon 2003). 
2. See Tex. Pen. Code Ann. § 12.42(d) (Vernon 2003). 
3. We find the organization discussed in published and unpublished cases in Texas dating
from 1990. See, e.g., Esparza v. Diaz, 802 S.W.2d 772, 778 (Tex. App.-Houston [14th Dist.] 1990,
no writ).
4. One of the identifying characteristics of membership in the cadre appears to be a willingness
to volunteer information regarding one's involvement, thus invoking the claimed power of the cadre
merely by uttering its name. 
5. See note 4. 
6. Errors in the original handwritten text are reproduced here. 
7. "Feo" is Anzualda's street name.
8. We note, as Delgado points out, that the State used the same basis for the admission of
Delgado's letter.
9. The cadre's organizational constitution was offered by the defense and admitted in evidence.
10. Delgado does not assert charge error.